UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOHN DOE and JANE DOE, Individually and  :
on behalf of M.S., an Infant, as Next Friends,  :
    :
    :
    :
         Plaintiffs,    :
    :
  -against-    :    14 Civ. 2953 (PAE)
    :
ANTHONY ANNUCCI, Acting Commissioner of the  :
New York State Department of Corrections and  :
Community Supervision; TINA STANFORD,  :
Chairwoman of the New York State Board of Parole;  :
WILLIAM HOGAN, Regional Director of New York  :
State Department of Corrections and Community  :
Supervision; JOSEPH LIMA, Bureau Chief of the  :
Manhattan VI Area Office of the New York State  :
Division of Parole; TERRENCE X. TRACY, Counsel  :
for the Board of Parole; Parole Officer EMILY  :
SCOTT; Parole Officer SIMON VALERIO; Parole  :
Officer REBECCA RODRIGUEZ; Parole Officer  :
RENNIE RODRIGUEZ; Senior Parole Officer FNU  :
ROSADO; Parole Officer FNU MERCEDES.  :
    :
    :
         Defendants.    :
-------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiff John Doe is a dedicated, loving and supportive father of six children.  He

has a close relationship with his five oldest children, who range in age from 14 to 27. Mr. Doe has never been accused of neglecting or abusing any of these children; to the contrary, they speak fondly of their relationship with him and his importance in their lives. Mr. Doe desperately wants to establish an equally loving bond with his one-year-old son, Plaintiff M.S. Defendants, however, have prevented him from doing so. They have imposed, as a condition of Mr. Doe's parole, a restriction on his contact with M.S. Not only does this condition mean that Mr. Doe risks re-incarceration if he sees his young son, but it also prevents Mr. Doe from living with his wife and M.S.'s mother, Plaintiff Jane Doe.[1]

Mr. Doe poses no danger to M.S. With the Defendants' permission, he lived with his wife and son without incident for seven months while on parole; recently, an expert in the evaluation and treatment of sex offenders found that Mr. Doe does not pose a risk to his son; and an expert from the sex-offender-treatment program that Mr. Doe completed while on parole has concluded that living with his son would be best for both Mr. Doe and society. Moreover, the complaining witness in the case for which Mr. Doe is currently on parole was a post-pubescent teenage girl. Ironically, the Defendants have permitted Mr. Doe unsupervised visits with his teenage daughter while on parole, but have barred him from contact with his infant son.

To justify tearing the Doe family apart, the Defendants have relied on the fact that Mr. Doe was convicted of a sex offense and the fact that Mr. Doe has maintained his innocence.

---

[1] Since this document is filed under seal, Plaintiffs have used their real names, except they have used initials when referring to minors. Plaintiffs request that if the Court issues an opinion to be released to the public, it refer to Plaintiffs by pseudonyms only.

His conviction alone, however, cannot possibly justify this harsh restriction on parental contact; otherwise, it would allow the Defendants to restrict the parental contact of anyone convicted of a sex offense against a minor—a clearly unconstitutional proposition. Moreover, experts with experience evaluating the recidivism risks posed by sex offenders note that Mr. Doe's claim that he is innocent does not increase his risk of re-offense— especially regarding his infant son.

As a final reason for their decision to prevent Mr. Doe from seeing his son, the Defendants have also relied on the complaining witness' statement to the Defendants that she did not believe that Mr. Doe should live a "happy and comfortable" life. The Defendants' determination that this young woman's opinion trumps the opinions of sex-offender-treatment experts and Mr. Doe's track record while living with his son for seven months reveals their true motivation for keeping Mr. Doe from his son—continued punishment.

Defendants' arbitrary refusal to allow Mr. Doe to have any contact with M.S. is causing severe and irreparable harm to the Doe family. M.S. is being deprived of the love and care of his father; Mrs. Doe is being forced to raise her son alone and is denied the companionship of her husband; and Mr. Doe is being denied the opportunity to care for and raise his son, as well as the companionship of his wife.

This Court should grant the Plaintiffs' motion and enter a preliminary injunction permitting Mr. Doe to live with his wife and their infant son during the pendency of this litigation.

## STATEMENT OF FACTS

Plaintiff John Doe is 49 years old.  (Declaration of John Doe, dated April 24, 2014 ("John Doe Decl.") ¶ 1.)  He married Plaintiff Jane Doe in 2007 and is the father of their son, Plaintiff M.S., who is a year old, as well as five children from previous marriages.  (*Id.* ¶¶ 3-4.)

### I.  JOHN DOE IS CONVICTED OF A SEX OFFENSE AGAINST A TEENAGE GIRL.

On May 11, 2005, Mr. Doe was convicted, after trial, of one count of second-degree rape, one count of second-degree criminal sexual act, and one count of endangering the welfare of a child.[2]  (*Id.* ¶ 5.)  The complaining witness in that case was the niece of Mr. Doe's ex-wife.  (*Id.*)  Mr. Doe was sentenced to five-and-one-half to thirteen years of incarceration.  (*Id.* ¶ 6.)  Mr. Doe has maintained his innocence and the conviction is currently on appeal.  (*Id.* ¶¶ 6, 8.)

### II.  JOHN DOE EXCELS IN PRISON PROGRAMMING AND SHOWS A COMMITMENT TO BETTERING HIMSELF.

Mr. Doe was a model inmate during his incarceration.  He completed the Department of Corrections and Community Supervision's ("DOCCS") Sex Offender Counseling and Treatment Program, where the counselors who administered the program frequently described him as "highly motivated."  (Declaration of Blair R. Albom, dated April 25, 2014 ("Albom Decl.") ¶ 3, Ex. A.)   Similarly, a corrections officer who supervised Mr. Doe for

---

[2] The jury acquitted Mr. Doe of one count of rape in the first degree, one count of sodomy in the first degree, and four counts of sodomy in the second degree.  (John Doe Decl. ¶ 5.)

approximately three years during his incarceration, wrote, "I admire [Mr. Doe's] willingness to do the right thing and get home to his family.  He is a role model inmate.  I feel he will be a credit to society and his family when returned home."  (Albom Decl. ¶ 4, Ex. B.)

While in custody, Mr. Doe divorced <sup>REDACTED</sup> and, in 2007, married Plaintiff Jane Doe.  (John Doe Decl. ¶¶ 3, 6.)  Mr. and Mrs. Doe had known each other for 25 years prior to their marriage.  (*Id.* ¶ 3.)  Mrs. Doe is currently 42 years old and the mother of two children—M.S., and a daughter who is 24 years old.  (Declaration of Jane Doe, dated April 24, 2014 ("Jane Doe Decl.") ¶¶ 1, 4.)

### III.    UPON JOHN DOE'S RELEASE FROM PRISON, DOCCS IMPOSES A PAROLE CONDITION PROHIBITING MR. DOE FROM HAVING CONTACT WITH MINORS.

Mr. Doe was released from prison to parole supervision on November 2, 2011, and he is scheduled to be on parole supervision until March 2, 2016.  (John Doe Decl. ¶¶ 12-13.) Prior to his release, Mr. Doe was classified by the Bronx Supreme Court as a Level Two sex offender.  (*Id.* ¶ 12.)

Upon his release, Mr. Doe moved in with Mrs. Doe in an apartment in the Bronx. (*Id.* ¶ 15.)  As with all individuals under supervision by DOCCS, Mr. Doe's release to parole was subject to certain conditions.  Likely because he was convicted of an offense involving someone under the age of 18, DOCCS imposed on Mr. Doe a prohibition on having contact with children under the age of 18 without written permission from his parole officer.  (*Id.* ¶

14.)  The Defendants have interpreted this "no contact" condition to apply to Mr. Doe's own children.

When he was released from prison, only one of Mr. Doe's five children was under the age of 18—his daughter L.S., who was then 12 years old.  (*Id.* ¶ 26.)  Mr. Doe's parole officer told him that, because of the "no contact" condition, he would prohibit Mr. Doe from seeing L.S. unless he received permission from a family court.  (*Id.*)  Mr. Doe quickly filed a petition in Bronx Family Court seeking unsupervised visitation with L.S., and the petition was granted on the consent of L.S.'s mother and Mr. Doe's ex-wife, REDACTED.  (*Id.*)

As a condition of his parole, Mr. Doe was required to participate in sex offender treatment, and DOCCS sent Mr. Doe to the New York Center for Addiction Treatment Services ("NYCATS") to fulfill this condition.  (*Id.* ¶ 10.)  Mr. Doe completed substance-abuse and sex-offender-treatment programs at NYCATS on September 29, 2012.  (*Id.* ¶ 11.)  He did so well there that, after his completion of the programs, the NYCATS Director of Operations asked Mr. Doe if he would like to be a peer mentor to other participants.  (*Id.*)

## IV.    DOCCS PROHIBITS JOHN DOE FROM LIVING WITH HIS WIFE AND NEWBORN SON.

In September 2012, Plaintiff Jane Doe gave birth to her and Mr. Doe's son, M.S. (Jane Doe Decl. ¶ 5.)  On October 4, 2012, Defendant Parole Officer Emily Scott, Mr. Doe's parole officer at the time, ordered Mr. Doe to move out of the family's home.  (John Doe Decl. ¶ 20.)  Officer Scott insisted that Mr. Doe sign a document on which she wrote that "residing with wife and new born [sic] is clearly a violation of [my] release conditions" and

6

that Mr. Doe "must seek visitation order with regard to new born [sic] child" and "can not [sic] have contact with child until approval by Family Court and Parole Officer Scott." (*Id.*)

To avoid re-incarceration, Mr. Doe complied with Officer Scott's order and immediately moved into the BRC Shelter in Manhattan. (*Id.* ¶ 21.) The next day, Mr. Doe petitioned the Bronx Family Court for unsupervised visitation with his son. (*Id.* ¶ 27.) Mrs. Doe consented to Mr. Doe's petition. (*Id.*) However, unlike with Mr. Doe's petition for visitation with L.S., the family court did not reach the petition's merits. Instead, on March 12, 2013, the court dismissed the petition without prejudice because "the conditions of the Petitioner's probation [sic] indicate that he is not to live in the same home as a child under the age of 18." (Albom Decl. ¶ 6, Ex. D.).

## V.    DOCCS PERMITS JOHN DOE TO RETURN HOME, WHERE HE REMAINS FOR SEVEN MONTHS WITHOUT ANY PROBLEMS.

Meanwhile, on January 26, 2013, Officer Scott told Mr. Doe that DOCCS had granted him permission to have contact with M.S. (John Doe Decl. ¶ 22.) That same day, Mr. Doe returned home to live with Mrs. Doe and M.S. (*Id.*) While at home, Mr. Doe devoted himself to the care and development of M.S.—he fed M.S., changed him, bathed him, played with him, and brought him to all of his doctor appointments. (Jane Doe Decl. ¶ 7.) Each day, Mr. Doe spent 30 minutes of "talk time" with M.S., during which he would speak to M.S. to aid M.S.'s development and to create a bond between Mr. Doe and his son. (*Id.*) Mr. Doe also took on household chores and did most of the cooking for the family. (*Id.* ¶ 8.)

On January 29, 2013, Steven Rego, a licensed master social worker who worked at NYCATS, met with Mr. Doe "to begin to assess his suitability to return to the home of his wife." (Albom Decl. ¶ 7, Ex. E.)  After meeting with both Mr. and Mrs. Doe, Mr. Rego concluded:

> [Mr. Doe] should be permitted to reside with his wife.  Cohabitation with a partner of the opposite sex is actually a protective factor for those who commit sexual offenses.  It also puts [Mr. Doe] with someone who can offer support if needed.  It is therefore conducive to the principles of relapse prevention.

(*Id.*)

## VI. DOCCS AGAIN FORCES JOHN DOE OUT OF HIS HOME, AND MR. DOE REQUESTS TO RETURN IMMEDIATELY.

On September 5, 2013, after Mr. Doe had lived at home with his wife and family for over seven months without incident, DOCCS ordered Mr. Doe out of his home for the second time.  (John Doe Decl. ¶ 24.)  He was again told that he would risk arrest for a parole violation if he had any contact with M.S.  (*Id.*)  He has lived apart from his family ever since.[3]

On September 17, 2013, an attorney for Mr. Doe sent a letter to the New York State Board of Parole; Defendant Anthony J. Annucci, Acting Commissioner of DOCCS; and Defendant Terrence X. Tracy, Esq., counsel for the Board of Parole.  (Albom Decl. ¶ 8, Ex.

---

[3] John Doe initially moved back to the BRC Shelter, and then received permission on November 8, 2013 to move to a studio apartment in the Bronx.  (John Doe Decl. ¶ 25.)  In addition to the rent Mrs. Doe pays to house herself and M.S., Mr. and Mrs. Doe spend $840 per month to rent Mr. Doe's apartment—money that they would not have to spend if the Defendants permitted the Doe family to live together.  (Jane Doe Decl. ¶ 10.)

F.)  The letter requested that DOCCS immediately permit Mr. Doe to return to his family's home.  (*Id.*)

Attached to counsel's letter were 25 letters from Mr. Doe's family members and friends.  (Albom Decl. ¶ 9, Ex. G.)  Specifically, all four of Mr. Doe's adult children, Mrs. Doe, Mrs. Doe's daughter, Mr. Doe's mother-in-law, six of his seven siblings, his aunts, his uncles, his cousins, his nieces, his nephew, his ex-sister-in-law, and two friends submitted letters on Mr. Doe's behalf.  (*Id.*)  In their letters, Mr. Doe's children described Mr. Doe's devoted parenting, their deep love and respect for him, and how he adored M.S.  (*Id.*)  The letters also discussed Mr. Doe's devotion to his grandchildren, his nephews and nieces, and even his friends' children.  (*Id.*)  Finally, many people who observed Mr. Doe with M.S. noted that the father and son had a powerful bond and were impressed with how well Mr. Doe cared for his son.  (*Id.*)

## VII.   DOCCS INITIATES AN INVESTIGATION INTO JOHN DOE'S REQUEST FOR PARENTAL CONTACT.

On October 2, 2013, Defendant Bureau Chief Joseph Lima told Mr. Doe's attorney that he would be initiating an investigation pursuant to DOCCS' Parental Contact Protocol (the "Protocol") regarding Mr. Doe's request, via his attorney's letter, for contact with his son.  (Albom Decl. ¶ 12, Ex. J.)  The Protocol, which DOCCS issued on August 21, 2013, establishes a procedure to be followed every time DOCCS imposes a parole condition that

limits or prohibits contact between someone under its supervision (a "releasee") and his or her child.  (Albom Decl. ¶ 10, Ex. H.)

The Protocol requires DOCCS officials to conduct an individualized investigation when a releasee contests its restriction of his or her parental contact.  (Albom Decl., Ex. H.) The investigation's purpose is to determine "the least restrictive conditions reasonably necessary and appropriate for a releasee to properly exercise his/her parental rights, while protecting his/her child(ren) and others from harm or danger." (*Id.* at 2.)  Parole officers are charged with conducting the investigation, and the Bureau Chief of the parole office to which the releasee reports is then tasked with issuing a decision after reviewing the results of the investigation.  (*Id.* at 3-5.)

The Protocol sets forth explicit time periods during which the investigation and any subsequent appeal must take place.  (*Id.*)  For instance, DOCCS' investigation into whether someone should be permitted parental contact should be completed within 45 days.  (*Id.* at 5.) If the investigation is delayed, the releasee may challenge the delay by submitting an "Inquiry Regarding the Timeliness of Investigation" to the Bureau Chief.  (*Id.* at 4.)  In response to such an inquiry, DOCCS must document "all of the reasons for delay and inform the releasee of the reasons for such delay." (*Id.* at 2.)

During his conversation with Mr. Doe's attorney on October 2, 2013, Bureau Chief Lima acknowledged that DOCCS had 45 days to complete the investigation into Mr. Doe's

request for contact with M.S., but said that he expected the investigation to be "expedited." (Albom Decl. ¶ 12, Ex. J.)

**VIII.  AN EXPERT IN THE FIELD OF SEX OFFENDING CONCLUDES THAT JOHN DOE DOES NOT POSE A RISK TO HIS SON.**

On November 18, 2013, while the investigation into Mr. Doe's case was ongoing, Mr. Doe's attorney provided Defendant Bureau Chief Lima and Defendant Tracy with a clinical evaluation of Mr. Doe conducted by Richard B. Krueger, M.D.  (Albom Decl. ¶ 11, Ex. I.) Dr. Krueger is Medical Director of the Sexual Behavior Clinic at the New York State Psychiatric Institute; an attending psychiatrist at New York State Psychiatric Institute and at Columbia-Presbyterian Medical Center; and Vice President of the New York State Association for the Treatment of Sexual Abusers.  (Albom Decl., Ex. I, at 10-14.)

Dr. Krueger performed several tests on Mr. Doe and found that Mr. Doe "did not make the criteria for pedophilia;" Mr. Doe was "normal, or not at all ill, compared with the thousand plus individuals with paraphilias and/or sexual disorders that [he had] evaluated;" when asked to "endorse items that reflect the degree of repulsion or attraction to various sexual scenarios," Mr. Doe "only endorsed items reflecting an interest in sexual activity with adult females;" Mr. Doe had a low or very low risk of sexual recidivism; Mr. Doe "was not sexually compulsive;" Mr. Doe was "exclusively heterosexual;" Mr. Doe did not "meet criteria for any psychiatric disorder;" or have any organic cognitive disorders; and Mr. Doe was not an alcoholic or a substance abuser.  (*Id.* at 5-9.)

Dr. Krueger also explained that the fact that Mr. Doe had maintained his innocence of the sex offense was not "correlated with an increased risk of recidivism." (*Id.* at 8.)  The doctor further noted that, even though he maintained his innocence, Mr. Doe "nonetheless was allowed to successfully complete two sexual offender programs, which substantially reduces his risk." (*Id.*)  Dr. Krueger concluded his report by recommending that Mr. Doe be allowed to reside with his wife and son.  (*Id.* at 9.)

## IX.    DOCCS VIOLATES ITS PARENTAL CONTACT PROTOCOL.

DOCCS' investigation into Mr. Doe's request for parental contact blatantly violated the Protocol's strict deadlines.  Although the Protocol requires DOCCS' investigation to take 45 days, the investigation into Mr. Doe's case took 143 days.  (Albom Decl., Ex. K.)

Moreover, Mr. Doe's attempt to get DOCCS to adhere to the Protocol was ignored. On December 3, 2013, Mr. Doe's attorney sent an "Inquiry Regarding the Timeliness of Investigation" to Bureau Chief Lima and Mr. Tracy noting that 63 days had passed since Bureau Chief Lima said that DOCCS would be initiating an "expedited" investigation. (Albom Decl. ¶ 12, Ex. J.)  The lawyer requested, pursuant to a provision in the Protocol, that DOCCS conclude its investigation immediately or inform her of the reasons for the delay. (*Id.*)

## X.    BUREAU CHIEF LIMA CONCLUDES THAT JOHN DOE MAY NOT HAVE ANY CONTACT WITH HIS SON.

Almost three months later, on February 21, 2014, Defendant Bureau Chief Lima released a one-paragraph determination denying Mr. Doe's request for contact with M.S. on February 21, 2014.  (Albom Decl. ¶ 13, Ex. K.)

The decision read:

> Please see attached documents.  After a thorough review of all the information submitted by the subject's attorney and the Parole Officer's intensive investigation of the subject, the instant offense and the subject's adjustment to supervision it is decided that it would not be in the best interest of the child to be put at risk if this was to be approved.  It should be noted that the subject committed a crime for which he was convicted by a jury.  In this ongoing event, the subject was extremely manipulative and engaged in behaviors that involved extensive grooming, intimidation and coercion of the 13 year old victim.  It should be noted that these crimes occurred within the family constellation and in some instances while other family members were present in the residence.  It should be considered that the subject presently denies guilt and has elicited quite a bit of community support.  Considering the degree of manipulation needed to engage in this crime without detection, the subject's denials are a significant concern.  While the attorneys have submitted several sex offender treatment provider who support the subject, it should be noted that none of these providers contacted the victim as was done by the Parole Officer in this case.  The victim's perspective is always important and in this case along with police reports reveal an extensive web of deception as part of this crime.  Based on the subject's denials there is no reason to believe that the subject has shown true progress in treatment.  Another consideration is the subject's daughter who is the same age as the victim in the instant offense.  It is not clear that the Family Court was provided with the complete information regarding the subject's crime.  As a result of the above this request is denied.

(*Id.*)

The documents attached to Defendant Bureau Chief Lima's decision reveal that everyone with whom Defendants Parole Officers Valerio, Rennie Rodriguez, and Rebecca Rodriguez spoke supported Mr. Doe's contact with M.S., other than the complaining witness

in his sex offense. (*Id.*) First, Mr. Doe's ex-wife REDACTED, who has known Mr. Doe for over 20 years, said that she believed he was a good father, and felt comfortable with him residing with his children. (*Id.* at 3.) Next, Jane Doe not only told the officers that she felt "completely safe with Mr. Doe residing with their son," but also reported that "her entire family trusts their children around Mr. Doe" and that "she has never observed him being inappropriate with children." (*Id.*) Additionally, Mr. Doe's 14-year-old daughter, L.S., said that she had never had a problem with her father. (*Id.*)

The documents also show that the complaining witness was reluctant to speak with the parole officers: Parole Officer Valerio had difficulty getting in touch with her initially, and after he spoke to her on the phone once, she did not return subsequent phone calls. (*Id.*) During their brief phone call, the complaining witness was asked whether she felt comfortable with Mr. Doe living with his family, and she replied, as reported by the parole officers, "Why should he live happy and comfortable when he took something from her that she can't get back." (*Id.*)

Finally, the documents accompanying Bureau Chief Lima's decision showed that the parole officers had completed their investigation into Mr. Doe's case on December 19, 2013—two months before Bureau Chief Lima issued a decision. (*Id.* at 1.)

Mr. Doe appealed Bureau Chief Lima's decision to defendant Regional Director William Hogan. (Albom Decl. ¶ 14, Ex. L.) In response, and pursuant to the Protocol,

Regional Director Hogan has scheduled a "Parental Case Conference" in Mr. Doe's case for May 5, 2014.  (Albom Decl. ¶ 15, Ex. M.)


XI.   **THE DENIAL OF PARENTAL CONTACT IS CAUSING ONGOING HARDSHIP TO THE DOE FAMILY THAT HAS PROGRESSIVELY WORSENED.**

The deprivation of their beloved husband and father has been a traumatizing experience for Mrs. Doe and M.S.  Mrs. Doe has suffered additional complications related to the pregnancy for which has had to receive treatment, including a hysteroscopy during which she was given anesthetics.  (Jane Doe Decl. ¶ 12.)  Mr. Doe was unable to care for Mrs. Doe and M.S. after Mrs. Doe underwent the procedure, and Mr. Doe will be unable to care for M.S. when Mrs. Doe undergoes additional related procedures, including a possible hysterectomy.  (*Id.*)  Mrs. Doe's physical activity may be limited after such a procedure and she will be unable to cook, clean, or do heavy lifting. (*Id.*)

Without Mr. Doe around, Mrs. Doe struggles each day to raise M.S. on her own while working a full-time job.  (*Id.* ¶ 11.)  Mrs. Doe has stated that M.S. misses his father and looks for him every night.  (*Id.*)  Mr. Doe's physical and emotional support had become an integral part of their daily lives as a family.  The Defendants have torn a family apart, and that action continues to harm the Doe family each day Defendant Bureau Chief Lima's decision remains in place.

# ARGUMENT

## I. PLAINTIFFS WILL CONTINUE TO BE IRREPARABLY INJURED WITHOUT THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

By barring Mr. Doe from having contact with his infant son M.S., Defendants have prevented him and his wife from exercising a fundamental right established by the Constitution—their freedom to associate with and to raise their own children.  Mr. and Mrs. Doe's "liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as of basic importance in our society . . ."); *Lyng v. Castillo*, 477 U.S. 635, 639 (1986) (state interference with family living arrangements burdens a fundamental right).

Courts have held that the denial of such fundamental rights for even a short period of time constitutes an irreparable injury.  *See Elrod v. Burns*, 427 U.S. 347, 373-74 (1976); *Conn. Dep't of Envtl. Prot. v. Occupational Safety & Health Admin.*, 356 F.3d 226, 231 (2d Cir. 2004); *Covinno v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992).  Because Mr. Doe's parole period continues until March 2, 2016, much is at stake—by the time the parole condition will be lifted, his child will already be nearly four years old.

The substantive and procedural due process violations at issue here constitute "irreparable harm" to each of the Plaintiffs.   This harm—interference with familial relationships—is "not remote or speculative but actual and imminent," and it cannot be made whole with monetary compensation.  *Tom Doherty Assoc. v. Saban Entm't*, 60 F.3d 27, 34 (2d Cir. 1995); *see also Doe v. Smith*, No. 06 Civ. 121, 2006 WL 383514, at *2 (N.D.N.Y. Feb. 16, 2006) (plaintiffs established that there would be irreparable harm where probation condition barred plaintiff father from contact with natural daughter).  It has long been established that where monetary damages cannot compensate for the injury, the harm is irreparable.  *See, e.g.*, *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966).

Further, a temporary restraining order and preliminary injunctive relief is necessary as each day that Mr. Doe is prohibited from seeing M.S., he is being deprived of his fundamental rights to raise, care for, educate and live with his child.  Even though she is in a loving, committed marriage, Mrs. Doe has been made, *de facto*, a single mother as a result of Defendants' actions.  Defendants have violated her constitutional rights to live with her husband and son as a family unit, to maintain her marriage, and to have her husband help raise their child.  Finally, the harm to M.S. cannot be overstated.  M.S.'s separation from his father likely will have a significant, irreparable impact on his life.  *See, e.g.,* Jeffrey Rosenberg & W. Bradford Wilcox, "The Importance of Fathers in the Healthy Development of Children," Office on Child Abuse and Neglect, U.S. Children's Bureau, *available at* www.childwelfare.gov/pubs/usermanuals/fatherhood/ (describing the numerous ways in

which a father's presence in a child's life benefits the child, including his cognitive and emotional development and psychological well-being).  Indeed,

> children who live absent their biological fathers are, on average, at least two to three times more likely to be poor, to use drugs, to experience educational, health, emotional and behavioral problems, to be victims of child abuse, and to engage in criminal behavior than their peers who live with their married, biological (or adoptive) parents.

"Quick Facts on Fatherhood," National Fatherhood Initiative, www.fatherhood.org/media/fatherhood-statistics#sthash.aocBtlvr.dpuf.

M.S. is fortunate to have a father who is eager to be a part of his life; Defendants' refusal to permit M.S. to have contact with his father will likely cause M.S. significant, lasting harm.  Any further delay will only prolong and cement the harm that M.S. has already suffered from the lack of contact with his father.  The only way to prevent further irreparable harm to Plaintiffs is to grant their request for a temporary restraining order and a preliminary injunction.

Defendants, by contrast, would suffer no harm if injunctive relief is granted.  *See Tremper v. Ulster County Dept. of Probation*, 160 F. Supp. 2d 352, 356-37 (N.D.N.Y. Aug. 22, 2001) (granting preliminary injunction to plaintiff challenging parole condition that prevented her from having contact with her boyfriend and co-plaintiff, with whom she had a child, and finding that "prohibiting the plaintiffs from living together as a family will cause injury that cannot be compensated by a damage award").

## II.   THERE IS A CLEAR AND SUBSTANTIAL LIKELIHOOD THAT PLAINTIFFS WILL PREVAIL ON THE MERITS.

### A.  John and Jane Doe Have A Fundamental, Constitutional Right to Raise their Child as a Family.

It is beyond question that the familial relationship implicates fundamental rights.  *See Troxel*, 530 U.S. at 65-66 (collecting cases confirming the "fundamental rights of parents to make decisions concerning the care, custody, and control of their children").  In particular, the right to "family privacy" and to conceive and to raise one's children is "fundamental," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), a "basic civil right[] of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), a right "far more precious . . . than property rights," *May v. Anderson*, 345 U.S. 528, 533 (1953), and "intrinsic in human rights, as they have been understood in 'this Nation's history and tradition,'" *Smith*, 431 U.S. at 842 (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977)).

The Due Process Clause of the Fourteenth Amendment is the source of these rights.  *See, e.g.*, *Moore*, 431 U.S. at 499; *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974).  The First Amendment likewise protects the right to intimate association.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) (noting that in a line of "freedom of association" decisions, the Supreme Court has held that the "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme").

The rights to a familial unit and intimate association are protected both substantively and procedurally. *See Smith*, 431 U.S. at 842. Therefore, when state action infringes on these rights, a court's analysis should focus on whether the action constitutes a substantive due process violation, *see, e.g.*, *Meyer*, 262 U.S. 390 (state legislation violated substantive due process), and whether the deprivation of the right was effected with adequate process pursuant to the burden-shifting framework under *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See, e.g.*, *Smith*, 431 U.S. 816 (procedure constitutionally adequate prior to deprivation of familial right at issue).

Because of the fundamental rights at stake, courts apply strict scrutiny when reviewing a state's decision to restrict someone's contact with his biological child as a condition of the person's supervision. *See, e.g.*, *United States v. Smith*, 606 F.3d 1270 (10th Cir. 2010); *United States v. Voelker*, 489 F.3d 139, 155 (3d Cir. 2007); *United States v. Myers*, 426 F.3d 117 (2d Cir. 2005) (Sotomayor, J.). Thus, a parole condition that limits a person's access to his wife and child is "'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest.'" *See Myers*, 426 F.3d at 126 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

### B. The State Has Not Shown that M.S. Faces Any Specific and Demonstrable Risk of Harm, as Required by Courts in This and Other Jurisdictions

Courts have been highly critical of supervised release conditions that deprive parolees of the ability to maintain relationships with their children. In *Myers*, the Second Circuit

assessed the constitutionality of a condition of federal supervised release that prohibited the defendant, who had been convicted of sexual offenses involving young girls and had been diagnosed with pedophilia, from having contact with his own child without advance authorization.  426 F.3d at 120, 122.  The Court remanded the case, concluding that the restriction would withstand constitutional scrutiny only if the district court developed a record showing that the defendant posed a threat to his five-year-old son and that the restriction did not represent a greater deprivation of liberty than reasonably necessary.  *Id.* at 120, 127-28.  The Court noted that the record failed to meet these requirements since both of the defendant's sex offenses involved girls; the focus of his pedophilia was an attraction to females; and the government offered no evidence that the defendant posed a danger to his male child.  *Id.* at 128.  *See also Smith*, 606 F.3d at 1283-84 (remanding to the district court where "the record d[id] not unambiguously support a finding that [defendant was] a danger to his own children or minor siblings"); *Voelker*, 498 F.3d at 155 (without an adequate showing that "children are potentially in danger from their parents, the states' interest cannot be said to be compelling, and thus interference in the family relationship is unconstitutional").

As in *Myers*, the Defendants have offered no evidence that Mr. Doe poses a danger to one-year-old M.S.  Mr. Doe was convicted of a sex offense against a post-pubescent girl, not an infant boy.  Moreover, unlike the defendant in *Myers*, an expert in the treatment of sex offenders recently concluded that Mr. Doe did not meet the criteria for pedophilia; did not have any sexual disorders; was interested in sex only with adult females; was not sexually

21

compulsive; was exclusively heterosexual; and presented a low or very low risk of sexual recidivism. (Albom Decl., Ex. I.) Mr. Doe also lived with M.S. for over seven months without incident. Therefore, there is even less of a justification for the "no contact" restriction in this case as there was in *Myers*.

By contrast to the plaintiffs in both *Smith* and *Voelker*, Plaintiff John Doe presents a "very low risk of sexual recidivism" and is "exclusively heterosexual." (*Id.*) Thus, there was no evidence before DOCCS to suggest a possible or even *plausible* risk of harm to Plaintiff M.S. or of any compelling circumstances to justify the denial of the fundamental rights of the Doe family.

Courts in other jurisdictions have similarly scrutinized and rejected conditions of release that bar parental contact absent evidence of imminent harm to the child. *See United States v. Davis*, 452 F.3d 991, 994-96 (8th Cir. 2006) (absent evidence the defendant had sexually abused or would sexually abuse his own children, the condition was overbroad and thus unconstitutional); *United States v. Loy*, 237 F.3d 251, 267-70 (3rd Cir. 2001) (because there was no evidence the defendant would be a danger to his own children, the condition was unnecessary and thus must be construed to apply only to children other than his own); *U.S. v. Hill*, Crim. No. 04–128–08, 2013 WL 4048250, at *6-7 (D.D.C. Aug. 12, 2013) (modifying "no contact with children" restriction to allow for contact with defendant's own children); *Goings v. Court Services and Offender Supervision Agency for Dist. of Columbia*,

786 F. Supp. 2d 48, 68-73 (D.D.C. 2011) (granting injunction against condition of release barring contact between defendant and his biological children).

### C. The State's Proffered Reasons for Breaking Apart the Doe Family Have Already Been Rejected by Other Courts as Insufficient.

In prior cases, courts in the State of New York have specifically rejected the same reasoning relied upon in Bureau Chief Lima's decision for tearing the Doe family apart—the nature of the plaintiff's conviction.  (Albom Decl., Ex. K.) ("Considering the degree of manipulation needed to engage in this crime"); ("an extensive web of deception as part of this crime").[4]  For example, in *Tremper*, a court in the Northern District of New York found that the "lengthy" criminal history of the plaintiff boyfriend was "insufficient to justify" a probation condition that prohibited the plaintiffs from living together as a family unit.  *See* 160 F. Supp. 2d at 355, 358.

More recently, another Northern District judge granted a preliminary injunction enjoining the enforcement of a probation condition prohibiting a registered, Level Three sex offender from living with his daughter.  *Doe v. Smith*, No. 06 Civ. 121, 2006 WL 383514, at *3 (N.D.N.Y. Feb. 16, 2006).  The court explained that nothing in the record showed that the plaintiff father's "arrests or convictions for sexual misconduct or endangering the welfare of

---

[4] Defendants also relied upon a brief interview with the victim, a relative of the plaintiff's ex-wife who does not live in the Doe household and has had no contact with the Doe family.  (Albom Decl., Ex. K.) ("While the attorneys have submitted several sex offender treatment provider [sic] who support the subject, it should be noted that none of these providers contacted the victim as was done by the Parole Officer in this case.  The victim's perspective is always important . . . .").  Further, Defendants also placed undue weight on [Mr. Doe]'s belief in his own innocence.  (*Id.*) ("Based on the subject's denials, there is no reason to believe that the subject has shown true progress") ("It should be considered that the subject presently denies guilt").  Neither the "victim's perspective," nor the releasee's belief as to his or her own guilt or innocence, are listed as factors to consider in Defendants' own Protocol (Albom Decl., Ex.

a child involved a child who was even close to the age of his infant daughter, who is eleven-months old." *Id.*  The court noted that the defendants did not "present[] any evidence to indicate that Plaintiff John Doe is a pedophile, that he has ever engaged in inappropriate conduct with very young children, or that he is likely to engage in such conduct in the future." *Id.*  Because there was no evidence showing "a rational basis" for the parental-contact restriction, the court found it likely that the plaintiffs would succeed on the merits and granted the preliminary injunction.  *Id.*

As in the numerous cases cited above, Defendants cannot show that Mr. Doe poses any risk of harm to one-year-old M.S.  To the contrary, the evidence shows that Mr. Doe is a committed father and husband whose relationship with both his wife and his son are being jeopardized by Defendants' threat to send him back to jail if he interacts with his son.  The "no contact" parole condition, therefore, is not "narrowly tailored to serve a compelling government interest."  *Myers*, 426 F.3d at 126; *see also Loy*, 237 F.3d at 269-70 (if there is not sufficient evidence "to support a finding that children are potentially in danger from their parents, the state's interest cannot be said to be 'compelling,' and thus interference in the family relationship is unconstitutional").

### D. Plaintiff's Procedural Due Process Rights Have Been Violated by Defendants' Inexcusable Delays.

Mr. Doe's procedural due process rights have also been violated by Defendants' failure to investigate his request to return home in a timely manner.  The Parental Contact

---

H,  at 3-5), nor can they survive an analysis under strict scrutiny.

Protocol was adopted by DOCCS, as a result of a class-action lawsuit, *Doe v. Overfield*, No. 08-CV-6294 (W.D.N.Y.), to protect the procedural due process rights of people in precisely Mr. Doe's position—people under DOCCS' supervision ("releasees") whose parental contact was being restricted by DOCCS.  Defendants blatantly violated the terms of the Protocol when applying it to Mr. Doe:  although the Protocol sets a strict 45-day time limit for an initial investigation to determine if a releasee poses any harm to his children, Defendants took five months to issue a decision. This delay was inexcusable.

Pursuant to the Protocol's provisions, Mr. Doe inquired into the timeliness of the investigation after over two months had passed and he had received no response. Additionally, the underlying documents that accompanied Bureau Chief Lima's decision indicate that DOCCS' investigation was completed on December 19, 2013—more than two months before Bureau Chief Lima issued his decision.  Defendants' actions show that the Protocol pays nothing more than lip service to the parental rights of people under DOCCS' supervision, and therefore does not satisfy procedural due process.

Although Mr. Doe has been informed of a parental case conference scheduled for May 5, 2014, the mere potential for a future administrative remedy is insufficient to address the ongoing violation to the constitutional rights of the Doe family to live together and cherish one another.  According to the protocol adopted by the Defendants, no immediate decision regarding an appeal is required at a parental case conference; in fact, the protocol allows for up to 30 additional days of delay.  Worse still, defendants have shown little regard for the

timelines set forth in their own protocol and have repeatedly ignored their own deadlines throughout this case.  Most importantly, with limited exceptions not applicable here, it is not a requirement for a plaintiff whose constitutional rights have been violated to exhaust administrative remedies prior to seeking injunctive relief in federal court.     Defendants have torn a family apart.  Mr. and Mrs. Doe seek injunctive relief to reunite their family without further unnecessary delay.

## CONCLUSION

The condition of Mr. Doe's parole that precludes his contact with his one-year-old son is a violation of Plaintiffs' substantive and procedural due process rights.  Plaintiffs have demonstrated irreparable harm and a clear and substantial likelihood of success on the merits. The Court should therefore grant Plaintiffs' motion and enter a preliminary injunction permitting Mr. Doe to live with his wife and their infant son during the pendency of this litigation.

Dated:   New York, New York
         April 25, 2014

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: /s/ Michael B. Mukasey
    Michael B. Mukasey
    (mbmukasey@debevoise.com)
    Blair R. Albom
    (bralbom@debevoise.com)
919 Third Avenue
New York, New York 10022
(212) 909-6062

OFFICE OF THE APPELLATE DEFENDER

By: /s/ Lauren Stephens-Davidowitz
    Lauren Stephens-Davidowitz
    (LStephens-
    Davidowitz@appellatedefender.org)
    Thomas M. Nosewicz
    (TNosewicz@appellatedefender.org)
11 Park Place, Suite 1601
New York, NY 10007
(212) 402-4100

*Attorneys for Plaintiffs John Doe, Jane Doe, and M.S.*

27