UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

                                                                  :

JOHN DOE and JANE DOE, Individually and on behalf                 :
of M.S. an Infant, as Next Friends,                               :

                                                                  :

                                        Plaintiffs,               :

                                                                  :          14 Civ. 2953 (PAE)

                        -v-                                        :
                                                                  :          OPINION & ORDER

ANTHONY ANNUCCI, Acting Commissioner of the                       :
New York State Department of Corrections and                      :
Community Supervision; JOSEPH LIMA, Bureau Chief                  :
of the Manhattan VI Area Office of the New York State             :
Division of Parole; Parole Officer EMILY SCOTT;                   :
Parole Officer SIMON VALERIO; Parole Officer                      :
REBECCA RODRIGUEZ; Parole Officer RENNIE                          :
RODRIGUEZ; Senior Parole Officer RICHARD                          :
ROSADO; and Senior Parole Officer JAMES                           :
CAPPIELLO,                                                        :

                                                                  :

                                        Defendants.               :

                                                                  :

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/15/2015

PAUL A. ENGELMAYER, District Judge:

Plaintiff John Doe was convicted of sexual offenses against a teenage girl and served

more than eight years in prison.  After Doe was released on parole, Doe's wife, Jane Doe, gave

birth to a son, M.S.  In the years that followed, the Department of Corrections and Community

Supervision ("DOCCS") applied one of Doe's special parole conditions to bar him, during two

distinct time periods, from having any contact with his infant son.  These periods totaled more

than one year.

John Doe, Jane Doe, and M.S. bring suit against eight state personnel associated with

DOCCS, claiming that DOCCS's actions violated their rights to substantive due process,

intimate association, and procedural due process, and that each individual defendant personally

participated in these actions.  Seven of the eight defendants now move to dismiss, asserting

mootness, immunity, and failure to state a claim.  For the following reasons, the motions to

dismiss are granted as to defendants Rebecca and Rennie Rodriguez for lack of personal

involvement in the alleged constitutional violations, but are denied as to all other defendants.

## I.   Background

### A.   Factual Background[1]

John Doe, age 50, resides in the Bronx, New York.  FAC ¶¶ 10, 22.  He works for a

company that provides foliage for special events and film shoots.  *Id.* ¶ 34.

In the early 2000s, Doe lived with his then-wife, Beverly Martin; their four children, who

are now between the ages of 15 and 28; and Martin's niece, now 26.  *Id.* ¶¶ 22, 24.  Doe was

accused of engaging in oral and vaginal sex with Martin's niece in 2002 and 2003, when she was

13 and 14 years old.  *Id.* ¶ 24.  On May 11, 2005, a jury convicted Doe of one count of second-

degree rape, one count of second-degree criminal sexual acts, and one count of endangering the

welfare of a child.  *Id.*  Doe maintains his innocence; his conviction is still on appeal.  *Id.*

On November 9, 2005, Doe and Martin divorced.  *Id.* ¶ 25.  On September 22, 2007,

while incarcerated, Doe married Jane Doe, a woman he had known for 25 years.  *Id.*

On November 2, 2011, after serving more than eight years in prison, Doe was released on

parole supervision.  *Id.* ¶¶ 24, 27.  He will be on parole until March 2, 2016.  *Id.* ¶ 28.  Upon

release, Doe moved into an apartment with his wife, Jane Doe.  *See id.* ¶ 37.

---

[1] These facts are drawn from the First Amended Complaint and the exhibits attached thereto.
Dkt. 100 ("FAC").  In resolving the motions to dismiss, the Court assumes all well-pled facts to
be true and draws all reasonable inferences in favor of the plaintiffs.  *See Koch v. Christie's Int'l
PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

The conditions of Doe's parole include that he "will have no contact with any person under the age of eighteen, without the written permission of the supervising parole officer." *Id.* ¶ 29, Exs. B–C.  To obtain permission to have contact with his youngest daughter, L.S., who was 12 years old at the time of his release, Doe filed a petition in Bronx Family Court. *Id.* ¶ 31, Ex. D.  Martin, L.S.'s mother, consented to this request. *Id.*  On February 1, 2012, the Bronx Family Court granted Doe's petition and authorized unsupervised visitation with L.S. *Id.*

In September 2012, Jane Doe gave birth to a son, M.S. *Id.* ¶ 36.  Soon after, John Doe successfully completed substance-abuse and sex-offender treatment programs at the New York Center for Addiction Treatment Services ("NYCATS"), as required by DOCCS. *Id.* ¶¶ 32–33. His attendance rate in that program was 100%; the Assistant Director found that he presented a low risk of recidivism; and, upon completion, he was invited to be a peer mentor. *Id.* ¶¶ 33, 39.

Notwithstanding those facts, on October 4, 2012, DOCCS Parole Officers Emily Scott, Richard Rosado, and James Cappiello informed Doe that he was not permitted to reside with minor children, was therefore required to move out of his family's apartment immediately, and was not allowed to have any contact with his month-old son, M.S., until such visitation had been approved by the family court and by Officer Scott. *Id.* ¶¶ 37–38, Ex. E.  That day, Doe moved into a homeless shelter. *Id.* ¶ 38.

On October 5, 2012, Doe filed a petition for visitation with M.S. in Bronx Family Court. *Id.* ¶ 40, Ex. F.  Jane Doe consented to the petition. *Id.*  However, on March 12, 2013, the Bronx Family Court dismissed Doe's petition without prejudice because "the conditions of [his parole] indicate that he is not to live in the same home as a child under the age of 18." *Id.* ¶ 41, Ex. F.

On January 24, 2013, Scott called Mary Osborne, Deputy Director of the Sex Offender Management Unit, to discuss Doe's parole conditions. *Id.* ¶ 44.  Osborne recommended that

3

John and Jane Doe both be evaluated by NYCATS, and that Scott discuss the results with Capiello and Bureau Chief Joseph Lima. *Id.* On January 29 and February 2, 2013, a NYCATS social worker met with Doe "to assess his suitability to return to the home of his wife." *Id.* ¶ 45, Ex. G. The social worker recommended that Doe "be permitted to reside with his wife," explaining that "[c]ohabitation with a partner of the opposite sex" is "conducive to the principles of relapse prevention" because it is "a protective factor for those who commit sexual offenses" and ensures that Doe has "someone who can offer support if needed." *Id.*

On February 7, 2013, based on the social worker's recommendation and on Doe's "extremely low risk of reoffending," Scott notified Doe that he could return to his family's apartment. *Id.* ¶ 46. While living there, Doe "was an active husband and father" and "complied with all of his parole conditions." *Id.* ¶¶ 47–48.

In June and July 2013, Rosado instructed Scott to review Doe's case and confirm that he was permitted to reside with his family. *Id.* ¶¶ 51–52. On August 6, 2013, Lima, in a change of course, instructed Rosado to ensure that Doe left his family's apartment. *Id.* ¶ 53. On August 22, 2013, Scott notified Doe that he was not authorized to reside with his son, M.S., who was then 11 months old, and "would have to move back to a homeless shelter." *Id.* ¶ 54. On September 5, 2013, another officer informed Doe that he would be arrested for a parole violation if he did not move out of his family's apartment immediately. *Id.* ¶ 55. Doe returned to the homeless shelter that day. *Id.* Doe was later permitted to move into a studio apartment. *Id.* ¶ 73. To enable the family to manage rent for two apartments, however, Jane Doe and M.S. moved into a one-bedroom apartment with Jane Doe's mother. *See id.* ¶¶ 73–74.

On October 2, 2013, in response to a letter from an attorney representing Doe, Lima commenced an investigation to address Doe's request to have contact with M.S. *Id.* ¶¶ 61–62.

Pursuant to a Protocol that DOCCS adopted in August 2013,[2] the agency had 45 days to complete the investigation. *Id.* ¶ 62, Ex. H. The officers involved in the investigation included Lima, Rosado, Scott, Rennie Rodriguez, Rebecca Rodriguez, and Simon Valerio, who was assigned to be Doe's primary parole officer in September 2013. *See id.* ¶¶ 56, 63–72. In support of Doe's request to return to his family's apartment, Jane Doe "express[ed] her strong desire to live with her husband" and told the officers that she "fe[lt] completely safe with [Doe] residing with their son." *Id.* ¶ 72. Martin also provided both oral and written statements expressing no objection to Doe's living with M.S., and L.S. told the officers that "she has never had a problem with her father." *Id.* Further, a clinical evaluation based on extensive psychological testing reported that Doe "did not make the criteria for pedophilia" and presented "a low or very low risk of sexual recidivism." *Id.* ¶ 75, Ex. J. The clinician therefore recommended that Doe be allowed to reside with his wife and infant child. *Id.* ¶ 77. The sex-offense victim, however, asked Officer Rebecca Rodriguez why Doe should "live happy and comfortable when he took something from [her] that [she] can't get back." *Id.* ¶ 72.

On February 21, 2014, following a lengthy and unexplained delay, Lima issued a one-paragraph order denying Doe's request to have contact with M.S. *See id.* ¶¶ 78–82, Exs. L–M. Noting that "[t]he victim's perspective is always important," the determination observed that Doe's "crimes occurred within the family constellation" and stated that Doe "was extremely manipulative and engaged in behaviors that involved extensive grooming, intimidation and coercion of the 13 year old victim." *Id.* ¶ 82. Lima's determination also expressed doubt as to whether Doe "has shown true progress in treatment" and concern about Doe's "daughter who is

---

[2] DOCCS created the Protocol during settlement negotiations in *Doe v. Overfield*, No. 08 Civ. 6294, a class-action lawsuit filed in the Western District of New York. *Id.* ¶ 58. As explained at page 30, *infra*, the plaintiffs here were not members of that class.

the same age as the victim in the instant offense." *Id.*  Lima therefore concluded that authorizing

any contact between Doe and M.S. would present "an unreasonable risk" and "would not be in

the best interest of the child." *Id.* ¶¶ 82–83.

On April 3, 2014, Doe notified William Hogan, a Regional Director of DOCCS, of his

intention to appeal Lima's decision.  *Id.* ¶ 85.  Pursuant to the Protocol, Hogan scheduled a

parental case conference with John and Jane Doe for May 5, 2014.  *Id.* ¶ 86.

On April 25, 2014, the Does filed the lawsuit now pending before this Court.  *See* Dkt. 1.

The Does also sought emergency relief, Dkt. 6–9; that application was the subject of a series of

hearings before this Court, and the Court expressed an interest in obtaining Hogan's decision

before ruling on the Does' application, *see* Dkt. 48, at 4–5.

On May 22, 2014, Hogan issued an order reversing Lima's decision and "allow[ing]

[Doe] contact with [M.S.]." FAC ¶ 87, Ex. O.  The order stated that it "may result in possible

reunification with his son in the marital household," but that Doe "is still subject to the original

condition of his release." *Id.* Ex. O.  Further, Hogan stated that the "decision does not preclude

any future decision to bar [Doe's] contact with his son based on emerging issues, conditions or

circumstances which would indicate to a parole officer that he is likely to or has sexually

reoffended any child." *Id.*

In response to an email from Doe's counsel, Hogan later clarified that his decision did not

define the "nature and type of contact" Doe could have with M.S. *Id.* ¶ 88, Ex. P.

On June 4, 2014, Doe's parole officer modified his parole conditions to "allow[]

unrestricted contact" between Doe and his minor children, M.S. and L.S. *Id.* ¶ 89, Ex. Q.  Since

then, John Doe has resided with Jane Doe and M.S. without incident. *Id.*

### B.    Procedural History

On April 25, 2014, plaintiffs commenced this case by filing a complaint, anonymously and under seal, in this District.  *See* Dkt. 1–5.  On May 2, 2014, plaintiffs moved for a temporary restraining order and preliminary injunction.  Dkt. 6–9.  That motion was withdrawn after DOCCS authorized contact between Doe and M.S. on May 22, 2014, *see* Dkt. 45, and revised Doe's parole conditions to allow unrestricted contact on June 4, 2014, *see* Dkt. 52, 56–58.

On June 26 and August 15, 2014, defendants Rosado and Scott each filed an answer to the complaint.  Dkt. 68, 94.  On July 2 and July 30, 2014, the remaining defendants filed motions to dismiss.  Dkt. 73, 82, 86.

On September 4, 2014, plaintiffs, with leave of the Court, filed the FAC.  Dkt. 100.  The FAC asserts three claims: violation of the Does' substantive due process rights, *see* FAC ¶¶ 90–97, freedom of association, *see id.* ¶¶ 98–104, and procedural due process, *see id.* ¶¶ 105–12.  It seeks relief including a declaration that the "restriction on John Doe's contact with M.S. was unconstitutional," a "permanent injunction barring enforcement of the challenged parole condition as applied to John Doe," monetary damages, and attorneys' fees and costs.  *Id.* at 30.  As defendants, the FAC names Anthony Annucci, the Acting Commissioner of DOCCS; Lima, Bureau Chief of the Manhattan VI Area Office of the New York State Division of Parole; and Parole Officers Cappiello, Rebecca Rodriguez, Rennie Rodriguez, Rosado, Scott, and Valerio.  *Id.* ¶¶ 13–21.  Shortly thereafter, on September 8, 2014, plaintiffs voluntarily dismissed their claims against Hogan, Milza Mercedes, Tina Stanford, and Terrence Tracy, who had been named as defendants in the original complaint.  *See* Dkt. 104.

Of the eight defendants named in the FAC, seven moved to dismiss in four separate motions, and one, Scott, filed an answer.

Specifically, on September 18, 2014, Annucci filed a motion to dismiss, Dkt. 112, and a supporting memorandum of law, Dkt. 114 ("Annucci Br."). The same day, Rosado separately moved to dismiss. Dkt. 116, 124 ("Rosado Br."). Also on September 18, 2014, Lima, Rebecca Rodriguez, Rennie Rodriguez, and Valerio (collectively, the "Lima defendants") jointly moved to dismiss. Dkt. 119, 121 ("Lima Br."). Around the same time, on September 26, 2014, Scott filed her answer. Dkt. 127. On October 2, 2014, plaintiffs filed a memorandum of law in opposition to the three motions to dismiss that had been filed on behalf of six defendants. Dkt. 130 ("Doe Br."). On October 9, 2014, Annucci and the Lima defendants submitted their replies. Dkt. 131 ("Annucci Reply Br."), 133 ("Lima Reply Br.").

On December 23, 2014, after receiving multiple extensions of time, Cappiello filed a motion to dismiss, Dkt. 141, and a supporting memorandum of law, Dkt. 143 ("Cappiello Br."). Finally, on January 20, 2015, plaintiffs filed their opposition to Cappiello's motion. Dkt. 145.

## II.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although a district court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

III.   **Discussion**

The four motions to dismiss assert a total of seven bases on which the moving defendants argue that the Court should dismiss the FAC: (1) mootness, (2) absolute immunity, (3) qualified immunity, (4) sovereign immunity,[3] (5) preclusion, (6) abstention, and (7) failure to state a claim. The Court addresses these claims in turn.

A.   **Mootness**

All moving defendants argue that this case is moot because plaintiffs challenge a restriction on Doe's contact with M.S. that is no longer in effect. Defendants acknowledge that Doe was twice barred from living with his family or visiting his son: between October 4, 2012 and February 7, 2013, and again between September 5, 2013 and May 22, 2014—for a total of more than one year. *See* FAC ¶¶ 37–38, 46, 55, 87. Defendants argue, however, that plaintiffs' claims were rendered moot on May 22, 2014, when DOCCS issued an order authorizing Doe to have contact with M.S., *id.* ¶ 87, and/or on June 4, 2014, when Doe's parole officer modified his parole conditions to allow unrestricted contact between Doe and M.S., *id.* ¶ 89.

"It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Dean v. Blumenthal*, 577 F.3d 60, 64 (2d Cir. 2009) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)). Accordingly, "[t]he requisite dispute must persist throughout the litigation." *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 118 (2d Cir. 2001). "If the dispute

---

[3] Defendant Annucci is sued only in his official capacity and relies on a sovereign immunity defense. The other six moving defendants are sued in both official and individual capacities; they assert absolute and qualified immunity defenses.

should dissolve at any time due to a change in circumstances, the case becomes moot," and the Court must dismiss the suit for lack of subject matter jurisdiction. *Id.* at 118–19.

However, "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012); *see also Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 724 n.3 (2010) (Alito, J., dissenting) (collecting cases). Rather, "[v]oluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (quoting *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)) (second alteration in original).

Concretely, voluntary cessation of a challenged activity renders a case moot only "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 110 (2d Cir. 2010) (quoting *Campbell v. Greisberger*, 80 F.3d 703, 706 (2d Cir. 1996)). This is a "formidable burden." *Seidemann v. Bowen*, 499 F.3d 119, 128 (2d Cir. 2007) (quoting *N.Y. Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 327 (2d Cir. 2003)).

Here, the pleadings and materials cognizable on a motion to dismiss do not indicate that DOCCS's decision to permit Doe to have contact with M.S. is "unconditional and irrevocable." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 728 (2013). Quite to the contrary, in the May 22, 2014 order authorizing such contact, Regional Director Hogan stated that his "decision does not

10

preclude any future decision to bar [Doe's] contact with his son based on emerging issues, conditions or circumstances which would indicate to a parole officer that he is likely to or has sexually reoffended any child." FAC Ex. O. Hogan's order also failed to define the "nature and type of contact" Doe and M.S. are permitted to have. *Id.* Ex. P. The parole officers thus retain substantial discretion over Doe's contact with his son. Doe's parole conditions were later modified to permit unrestricted contact with M.S., *id.* ¶ 89, but the order that did so contains no representations or assurances about future modifications, *id.* Ex. Q.

It is plausible that the parole officers will later exercise their discretion to prevent Doe from living with or visiting M.S. As pled, DOCCS has changed course no fewer than four times, and has twice forbidden Doe from having any contact with his infant son: First, after allowing Doe to have unsupervised visits with his 12-year-old daughter and overseeing his successful completion of a sex-offender treatment program, parole officers abruptly required Doe to move out of his family's apartment and forbade all contact with M.S. FAC ¶¶ 31–33, 37–38. Second, after separating Doe from M.S. for four months, the officers abruptly allowed Doe to resume contact with M.S. and return to his family's apartment. *See id.* ¶ 46. Third, after Doe had lived with his wife and son without incident for nearly seven months, the officers inexplicably required him to vacate the marital home and once again cease contact with M.S. *Id.* ¶¶ 54–55. After a four-month investigation, Bureau Chief Lima affirmed the no-contact order. *Id.* ¶¶ 78–82, Exs. L–M. Based on the crimes Doe committed against a teenage girl more than a decade earlier, personal doubts as to whether Doe "ha[d] shown true progress in treatment," and concerns about Doe's 12-year-old daughter, Lima stated, in a one-paragraph determination, that "it would not be in the best interest of the child" to authorize contact between Doe and M.S. *Id.* ¶ 82, Ex. L. Fourth, after another eight months of separation and the filing of this lawsuit, and

11

after proceedings for emergency relief had commenced before this Court, Regional Director Hogan issued a two-page order reversing Lima's decision and "allow[ing] [Doe] contact with [M.S.]." *Id.* ¶ 87, Ex. O.

To be sure, DOCCS has now permitted Doe to live with M.S. since May 22, 2014, a period of more than a year. But that period has coincided with the pendency of this lawsuit, which may have served to deter DOCCS from reversing course and reinstating terms that would separate Doe from his son. Further, because "the [defendants] continue[] to defend the legality of [their actions], it is not clear why the[y] would necessarily refrain from [resuming such actions] in the future." *Knox*, 132 S. Ct. at 2287. Until Doe is released from parole in March 2016, he faces the risk of another reversal from the DOCCS. The defendants therefore have not demonstrated that "there is no reasonable expectation that the alleged violation will recur," and the case is not moot. *Clear Channel Outdoor, Inc.*, 594 F.3d at 110.

Furthermore, even if discovery reveals that DOCCS is precluded from changing course yet again, Doe will retain a claim for damages for past injuries. And as the Second Circuit has repeatedly held, a defendant's "withdrawal of [a] challenged policy does not render moot [a plaintiff's] requested relief for past constitutional violations." *Dean*, 577 F.3d at 66 (citing, *inter alia*, *Stokes v. Village of Wurtsboro*, 818 F.2d 4, 6 (2d Cir. 1987) ("Claims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable.")). And even if the "actual damages are speculative, '[i]t is clear that nominal damages are available in actions alleging violations of constitutionally protected rights.'" *Id.* (quoting *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 141 (2d Cir. 1994)). The Court therefore rejects defendants' claims of mootness.

### B.     Absolute Immunity

Six moving defendants (all but Annucci) argue that they are entitled to absolute immunity.  They contend that determining special parole conditions is a quasi-judicial, adjudicatory function.  The Court holds otherwise.

"A limited number of officials are entitled to absolute immunity from § 1983 damages liability for their official acts." *Scotto v. Almenas*, 143 F.3d 105, 110 (2d Cir. 1998).  "However, because absolute immunity 'detracts from section 1983's broadly remedial purpose,'" *id.* (quoting *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992)), "'[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties,'" *id.* (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)) (alteration in original); *Dorman v. Higgins*, 821 F.2d 133, 136 (2d Cir. 1987) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) ("Absolute immunity is rarely granted; qualified immunity is the norm."). "Absolute immunity is proper only in those rare circumstances where the official is able to demonstrate that the application of absolute immunity to the circumstances presented is required by public policy." *Scotto*, 143 F.3d at 110.

In resolving whether an official is entitled to absolute immunity, the Court must consider two factors: "the need for absolute immunity in order to permit the effective performance of the function, and the existence of safeguards against improper performance." *Dorman*, 821 F.2d at 136.  "[A]bsolute immunity protects officials in their adjudicative or prosecutorial functions only." *Farrell v. Burke*, No. 97 Civ. 5708 (DAB), 1998 WL 751695, at *4 (S.D.N.Y. Oct. 28, 1998) (citing *Scotto*, 143 F.3d at 110); *see also Dorman*, 821 F.2d at 136 ("Functions most apt to be accorded absolute, rather than qualified, immunity are those integrally related to the judicial process."). But absolute immunity "does not protect those same officials in the performance of

administrative or investigative functions." *Farrell*, 1998 WL 751695, at *4. This distinction reflects a "'functional approach'"; "the level of immunity 'flows not from rank or title or location within the Government, but from the nature of the [official's] responsibilities.'" *Scotto*, 143 F.3d at 110 (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985)).

Applying these principles, the Second Circuit, and several other courts of appeals, have held that "a parole board official is absolutely immune from liability for damages when he 'decide[s] to grant, deny, or revoke parole,' because this task is functionally comparable to that of a judge." *Scotto*, 143 F.3d at 111 (quoting *Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir. 1981)) (alteration in original); *see also Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999) (collecting cases); *Davis v. N.Y. State Div. of Parole*, No. 07 Civ. 5544 (NRB), 2008 WL 3891524, at *12 (S.D.N.Y. Aug. 20, 2008); *LaBounty v. Coombe*, No. 95 Civ. 5592 (MBM), 1999 WL 177438, at *5 (S.D.N.Y. Mar. 30, 1999), *aff'd*, 208 F.3d 203 (2d Cir. 2000). For similar reasons, courts in this District have held that the imposition of special parole conditions can be an adjudicative act that merits absolute immunity. *See Farrell*, 1998 WL 751695, at *4; *Stewart v. Smallwood*, No. 92 Civ. 4043 (SS), 1993 WL 77381, at *1 (S.D.N.Y. Mar. 15, 1993) (collecting cases).

By contrast, the Second Circuit has twice held that "a New York State parole officer who had recommended that a warrant be issued for a specific parole violation, but did not otherwise 'prosecute' the parole revocation, was not entitled to absolute immunity." *Taylor v. Sullivan*, 166 F.3d 1201, 1201 (2d Cir. 1998) (unpublished opinion). The Circuit reasoned that such actions are not "integrally related to the judicial process." *Scotto*, 143 F.3d at 111 (quoting *Dorman*, 821 F.2d at 136). Nor did the officer "have broad discretion in deciding whether a

proceeding should be brought and what sanctions should be sought." *Id.* at 112 (quoting *Butz v. Economou*, 438 U.S. 478, 515(1978)).

Here, the parole officers are clearly not entitled to absolute immunity for the allegedly wrongful actions they took in the course of *implementing* the decisions to separate Doe from M.S. *See Farrell*, 1998 WL 751695, at *4. The more difficult question is whether the officers should be accorded absolute immunity for *making* those decisions. The parties have not identified, and the Court has not found, any cases from this Circuit that resolve whether parole officers are entitled to absolute immunity for discretionary decisions applying parole conditions. For the following four reasons, the Court's considered judgment is that they are not.

First, the application of parole conditions is not "integrally related to the judicial process." *Dorman*, 821 F.2d at 136. As to this point, the Ninth Circuit's reasoning in *Thornton v. Brown*, 757 F.3d 834 (9th Cir. 2013), is persuasive. The Ninth Circuit distinguished there between the *imposition* of parole conditions and the *enforcement* of such conditions. The imposition of parole conditions is "'integrally related to an official's decision to grant or revoke parole,' which is a 'quasi-judicial' function'" entitled to absolute immunity. *Id.* at 840 (quoting *Swift v. California*, 384 F.3d 1184, 1189 (9th Cir. 2004)). And, as noted, the Second Circuit similarly affords absolute immunity to a decision "to grant, deny, or revoke parole." *Scotto*, 143 F.3d at 111 (citation omitted). On the other hand, the Ninth Circuit reasoned, "the manner in which [parole officers] implement[] [a] condition" is "an element of their supervisory function" and therefore merits only qualified immunity. *Thornton*, 757 F.3d at 840 (citing *Anderson v. Boyd*, 714 F.2d 906, 910 (9th Cir. 1983)). This conclusion accords with Second Circuit precedent holding that certain supervisory functions—including investigating parole violations

15

and recommending revocation of parole—receive only qualified, not absolute, immunity. *See Scotto*, 143 F.3d at 112–13.

Here, the series of decisions regarding Doe's contact with M.S. had no relation to the decision to grant his parole, but were in the nature of applying a preexisting condition, and the officers were not acting "as an arm of the court." *Dorman*, 821 F.2d at 137. Because these actions were supervisory, not judicial or quasi-judicial, the officers are not entitled to absolute immunity.

Second, assessing the policy considerations the Second Circuit has identified as relevant, absolute immunity is not necessary for "the effective performance of the function" at issue. *Id.* at 136. The decision in *Robison v. Via*, 821 F.2d 913 (2d Cir. 1987), although arising in a different factual context, is instructive. At issue there was a decision by an assistant state attorney and a state trooper to remove two children from their parents' custody based on a report of sexual abuse. *Id.* at 915. The Second Circuit rejected the claim that the "investigation of alleged child abuse is a function so sensitive as to require a total shield from judicial review." *Id.* at 919. Although recognizing that such investigation "is obviously vital to interests of the child and of society as a whole," the Court concluded that the officials' ability to investigate complaints of abuse would not be undermined "by according them qualified rather than absolute immunity." *Id.* at 920.

The parole officers here were forced to engage in a similarly difficult balancing of Doe's fundamental right to have contact with his own young child and the need to protect M.S. from abuse. However, there is no indication that the officers' duties "cannot be performed properly unless all scrutiny is denied." *Id.* at 919. Indeed, tellingly, no moving defendant argues that a

grant of absolute immunity is essential to properly supervising parolees and applying parole conditions.

Third, at least as pled, there are not adequate alternative "safeguards against improper performance" of the duties in question. *Dorman*, 821 F.2d at 136.  As a point of contrast, the Second Circuit has held that "federal probation officers [are] to be accorded absolute immunity in connection with their preparation and presentation of presentence reports," in significant part because "the presentence report is subject to a number of procedural safeguards"; these include the parties' opportunity to object to inaccuracies in the report and to appeal a sentence to a federal appellate court. *Id.* at 138.  Here, by contrast, Doe alleges that the decisions to terminate his contact with his son were not made pursuant to a formal adversarial process that affords such opportunities.  Indeed, as pled, Doe did not receive notice that the officers were deciding whether to terminate his contact with M.S., *see* FAC ¶¶ 37, 53–55; was not afforded an opportunity to be heard, *see id.*; and was unable to appeal the decision to an independent tribunal, *see id.* ¶¶ 40–41, Ex. F (alleging that Bronx Family Court deferred to the existing parole conditions and dismissed Doe's petition for visitation without ruling on its merits).[4]  Moreover, although the appeal to Regional Director Hogan led to a favorable outcome, Hogan's decision was issued while an application for emergency relief was pending with this Court; it is by no means clear that Doe's bid for review would otherwise have received a comparably fresh review.  *See* FAC ¶¶ 85–88, Ex. O.  In light of these procedural shortcomings, the important fundamental rights at stake "strongly [favor] the granting of only a qualified immunity, in which the objective

---

[4] On paper, the Protocol created in 2013 appears to address some of these shortcomings. *See id.* ¶¶ 57–60, Ex. H.  In Doe's case, however, as alleged, DOCCS did not comply with the Protocol. *See id.* ¶¶ 78–82.

reasonableness of a removal of the child from the parents' custody would be subject to judicial review." *Robison*, 821 F.2d at 920.

Fourth, extending absolute immunity to parole officers applying parole conditions would significantly expand the scope of such immunity.  Like many convicted sex offenders, Doe is subject to several dozen parole conditions, more than 30 of which vest the parole officers with discretion similar to that at issue here.  FAC Ex. B–C.  In addition to the power to decide whether Doe may have contact with any person under age 18, a parole officer has authority to grant or deny permission for Doe to own a camera, computer, scanner, or cell phone; possess "any children's products" or photos of minors; rent a post office box; obtain a driver's license; "rent, operate or be a passenger in any vehicle"; travel outside of New York City; visit an arcade, bowling alley, beach, or swimming pool; or have visitors at his approved residence.  *See id.*  Particularly given the presumption against absolute immunity, *see, e.g.*, *Scotto*, 143 F.3d at 110, there are sound reasons not to give parole officers discretion, unreviewable in a subsequent court action, over so many aspects of a parolee's life.

Finally, as a practical matter, the Court notes that absolute immunity does not bar suits for injunctive or declaratory relief.  *Shmueli v. City of New York*, 424 F.3d 231, 239 (2d Cir. 2005) (citing, *inter alia*, *Pulliam v. Allen*, 466 U.S. 522, 536–37 (1984)).  Accordingly, Doe's claims for such relief would persist regardless of its resolution of the immunity claim, and the affected defendants would remain parties to this case.

## C.    Qualified Immunity

The same six defendants alternatively claim that they are entitled to qualified immunity. They argue, in essence, that in deciding to terminate Doe's parental rights, they engaged in a

difficult balancing between Doe's parental rights and his family's need for protection, and that their ensuing decisions, erroneous or not, were reasonable under the law and made in good faith.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)); *see also, e.g.*, *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Accordingly, for an action to lie, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 135 S. Ct. at 2044 (quoting *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2083 (2011)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Sheehan*, 135 S. Ct. at 1774 (quoting *al-Kidd*, 131 S. Ct. at 2085) (alteration in original).

Significant here, defendants pursue qualified immunity on a motion to dismiss. And "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). Specifically, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* "[T]he motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that

would entitle him to relief.'" *Id.* (quoting *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992)).  The defendants therefore face a "formidable hurdle." *Id.* at 434.

As to the decisions made here for which the defendants seek immunity, at the time the defendants acted, "[i]t [wa]s well-established that a parent's interest in maintaining a relationship with his or her child is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005).  Indeed, the Supreme Court had described "the interest of parents in the care, custody, and control of their children" as "the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion); *see also, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents.").  Further, it was established that "[c]hildren have a parallel constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily family association." *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (quoting *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000)); *see also Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) ("Th[e] right to the preservation of family integrity encompasses the reciprocal rights of both parent and children.").

In two previous cases, the Second Circuit has applied these well-established principles to analogous parole conditions.  First, in *United States v. Myers*, 426 F.3d 117 (2d Cir. 2005), the defendant faced a "special condition prohibiting him from spending time alone with his child absent advance authorization from the U.S. Probation Office." *Id.* at 120.  Writing for the panel,

then-Judge Sotomayor noted that the "conditions of supervised release must 'involve[] no greater deprivation of liberty than is reasonably necessary.'" *Id.* at 124 (quoting 18 U.S.C. § 3583(d)) (alteration in original). Where "the liberty interest at stake is fundamental, a deprivation of that liberty is 'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest." *Id.* at 126 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). On the record before the Circuit, however, the panel could not resolve whether the challenged parole condition satisfied strict scrutiny. *Id.* at 127–30. The Circuit thus remanded to the district court to balance "the intended purpose of the challenged condition" against the defendant's interest, if any, "as the parent of a child in foster care born out of wedlock." *Id.*

Second, in *United States v. McGeoch*, 546 F. App'x 44 (2d Cir. 2013) (summary order), the parole conditions imposed at sentencing provided that, upon release, the defendant "shall not have any direct contact . . . with a person under the age of 18 unless it is supervised by a person approved of by the probation officer." *Id.* at 46. This broadly worded condition, by its terms, would restrict the defendant's contact with his sons, who were to be 12 and 14 on the anticipated date of his release. *Id.* at 47–48. Significant here, the Second Circuit, applying extant precedent, held that "[a] condition of supervised release that prevents a father from seeing his children outside the presence of an approved monitor is a severe one subject to careful scrutiny." *Id.* at 48. "Absent an individualized inquiry into whether [the defendant's] sexual proclivities pose a threat to his sons," the "imposition of a harsh condition of supervised release that either prohibits interaction with his children or makes such interaction subject to supervision by a person approved of by the probation officer violates [his] due process rights." *Id.* at 49. Because the district court had not "articulate[d] why such a severe intrusion on the fundamental right to familial association was necessary under the circumstances," the Second Circuit remanded. *Id.*

To be sure, these two cases involved the imposition of parole conditions by a district court judge rather than application of such conditions by parole officers, but they are germane to the reasonableness of the defendants' actions here because denial of qualified immunity "do[es] not require a case directly on point." *Taylor*, 135 S. Ct. at 2044 (quoting *al-Kidd*, 131 S. Ct. at 2083). It is sufficient that "existing precedent . . . have placed the statutory or constitutional question beyond debate." *Id.*

Here, it is beyond dispute that both Doe and M.S. had a fundamental liberty interest in their familial relationship, and so constraints imposed by parole officers were required to have been "narrowly tailored to serve a compelling government interest." *Myers*, 426 F.3d at 126. Although the state has a compelling interest in preventing child abuse, a reasonable parole officer could not conclude that the deprivation of literally all contact between Doe and M.S., absent factual justification, was a narrowly tailored restriction. And on the facts pled, such justification was lacking. Doe had successfully completed sex offender treatment, FAC ¶¶ 26, 32–33; presented an extremely low risk of recidivism, *id.* ¶¶ 39, 46, 75–77; had unsupervised visits with his teenage daughter, *id.* ¶¶ 31, 72; and lived with his son without incident for significant periods of time, *id.* ¶¶ 46, 72, 89. To be sure, Bureau Chief Lima, in explaining his determination, expressed concerns about Doe's past sexual offense against a teenage girl. *See id.* ¶ 82. But it does not follow that Doe's "sexual proclivities pose a threat to his son[]," *McGeoch*, 546 F. App'x at 49; on the contrary, a clinical evaluation found that he "did not make the criteria for pedophilia" and was "exclusively heterosexual." *Id.* ¶ 75. Accordingly, considering the facts pled, the balance of interests favored either family reunification or, at the least, an intermediate step such as supervised visitation. Viewing the pleadings in the light most favorable to the

plaintiffs, the denial of all contact between Doe and his newborn and later infant son therefore

violated clearly established law.[5]

Further, on the facts pled, it was unreasonable for a parole officer to deprive Doe of all

contact with his son without any process. As the Supreme Court has long instructed, "[t]he

essence of due process is the requirement that 'a person in jeopardy of serious loss [be given]

notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424 U.S. 319,

348–49 (1976) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72

(1951) (Frankfurter, J., concurring)). Under the familiar *Mathews* test:

> [I]dentification of the specific dictates of due process generally requires
> consideration of three distinct factors: First, the private interest that will be affected
> by the official action; second, the risk of an erroneous deprivation of such interest
> through the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's interest, including
> the function involved and the fiscal and administrative burdens that the additional
> or substitute procedural requirement would entail.

*Id.* at 335 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263–71 (1970)).

As of the time the defendants here acted, the Second Circuit, "in a substantial line of

cases, ha[d] addressed the standards by which a state actor is measured for due process purposes

when he or she removes a child from a parent's custody in the interests of the safety of the

child." *Kia P.*, 235 F.3d at 759. As to the first *Mathews* factor, the Second Circuit had

recognized "the very great importance of the private liberty interest . . . of a parent in the

companionship, care, custody and management of his or her child." *Duchesne*, 566 F.2d at 828

---

[5] Defendants argue that Doe has "no inherent constitutional right to parole," Annucci Br. 21, or
to "be[] free from special conditions of release," Rosado Br. 9, Lima Br. 9, Capiello Br. 9. But
that argument misses the point. As defendants concede, parole conditions must be "reasonably
related to past conduct," "not arbitrary and capricious," and "designed to deter recidivism and
prevent further offenses." *Id.*; *see also Boddie v. N.Y. State Div. of Parole*, 285 F. Supp. 2d 421,
428 (S.D.N.Y. 2003). As pled in the FAC, the application of Doe's parole conditions to deny
him access to his son was arbitrary and cannot satisfy this standard.

n.26 (citation omitted); *see also, e.g.*, *Rivera v. Marcus*, 696 F.2d 1016, 1027 (2d Cir. 1982)

("[Plaintiffs] seek protection from state action which threatens the integrity and stability of their

familial relationship. This important interest has consistently been recognized and afforded far-

reaching due process protection."). And it had observed that "the 'fact specific' nature of the

determination of the fitness of a parent presents a grave risk of erroneous deprivation when the

action of the state is not promptly reviewed." *Duchesne*, 566 F.2d at 828 n.26. In light of these

factors, even if a parent and child must be separated on an "emergency basis," the Second Circuit

had held, "the state has the duty to initiate a 'prompt' post-deprivation hearing." *Kia P.*, 235

F.3d at 754, 760 (citation omitted).

Measured against these standards, the facts pled support a claim that the defendants'

decision to deny Doe access to his son was unreasonable—and a clear violation of procedural

due process. As alleged in the FAC, the parole officers first informed Doe that he was not

allowed to have any contact with M.S. on October 4, 2012. FAC ¶¶ 37–38. Before that date,

Doe had not received any notice that DOCCS was considering making such a decision, nor was

he given a pre- or post-deprivation opportunity to be heard. *See id.* On August 22, 2013, after

authorizing family reunification for some months, the officers again told Doe that he could not

reside or have contact with his infant son, M.S. *Id.* ¶ 54. Although DOCCS commenced an

investigation shortly after Doe moved out of his family's apartment, Doe did not receive an

opportunity to be heard until May 5, 2014, months after he was separated from M.S. *Id.* ¶ 86.

To be sure, at this early stage, the Court cannot resolve precisely what procedures were required

in this context, and the facts established in discovery or at trial may diverge materially from

those pled. But, as alleged, the procedural safeguards available to Doe—or, more accurately, the

lack thereof—were sufficiently plainly unconstitutional as to counsel against a finding of qualified immunity.

Finally, again as a practical matter, qualified immunity, like absolute immunity, "only bars monetary damages—it does not bar declaratory or injunctive relief." *Robinson v. New York*, 486 F. App'x 905, 907 (2d Cir. 2012) (summary order) (citing *Adler v. Pataki*, 185 F.3d 35, 48 (2d Cir. 1999)).  Therefore, a grant of qualified immunity would not result in any defendant's dismissal from this case, but only from the portion of plaintiffs' claims directed at money damages.

### D.      Sovereign Immunity

Annucci, who is sued only in his official capacity, argues that the Court must dismiss all claims against him on the basis of sovereign immunity.

The Eleventh Amendment bars suits in federal courts against states and state officials acting in their official capacities by their own citizens, citizens of another state, and foreign sovereigns. *City of Shelton v. Hughes*, 578 F. App'x 53, 54–55 (2d Cir. 2014) (summary order) (citing, *inter alia*, *W. Mohegan Tribe & Nation v. Orange County*, 395 F.3d 18, 20 (2d Cir. 2004)).  However, "[u]nder the well-known exception to this rule first set forth in *Ex parte Young*, 209 U.S. 123 (1908), a plaintiff may sue a state official acting in his official capacity— notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law." *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007).  "[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va.*

*Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1639 (2011) (quoting *Verizon Md. Inc.*

*v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)) (second alteration in original).

Doe's requests for monetary and declaratory relief are retrospective.  His claim for

injunctive relief against Annucci, by contrast, is prospective—Doe seeks to bar certain future

applications of the special parole condition.  Doe's claim for injunctive relief therefore falls

within the *Young* exception so long as the complaint alleges an "ongoing violation of federal

law."  *Stewart*, 131 S. Ct. at 1639; *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261,

281 (1997) ("An allegation of an ongoing violation of federal law where the requested relief is

prospective is ordinarily sufficient to invoke the *Young* fiction.").

The violation alleged here cannot be properly characterized as "ongoing" if that term

requires a continuous violation.  That is because Doe presently lives with his family and is

permitted to have unrestricted contact with his minor children.  FAC ¶ 89.  But the alleged

violation can be construed as "ongoing" in that, until Doe is released from parole in March 2016,

the parole officers appear to be able, at any time, to reverse course and terminate Doe's contact

with M.S.  *See* pp. 10–12, *supra*.  Accordingly, the decisive legal question as to Annucci's bid

for sovereign immunity is whether the possibility of a future violation suffices to render that

violation "ongoing."

Neither the Supreme Court nor the Second Circuit has squarely addressed this question.

But other courts of appeals have held that the challenged action need not literally "be in

progress" to defeat a claim of sovereign immunity; rather, "where there is a threat of future

enforcement that may be remedied by prospective relief, the ongoing and continuous

requirement has been satisfied."  *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th

Cir. 1999); *see also* Charles Alan Wright et al., 13D Fed. Prac. & Proc. § 3566, at 292 (3d ed.

26

2008) ("[T]he best explanation of *Ex parte Young* and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution and laws.") (quoted in *Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor*, 107 F.3d 1000, 1006 (2d Cir. 1997)); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001) ("The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent."); *Vickery v. Jones*, 100 F.3d 1334, 1346 (7th Cir. 1996) ("[T]he *Young* exception permits relief against state officials only when there is an ongoing or threatened violation of federal law."); *Han v. U.S. Dep't of Justice*, 45 F.3d 333, 338 (9th Cir. 1995) (Eleventh Amendment bars suits where "[t]here is no allegation that the state defendants are likely to approve third party agreements in the future or that plaintiffs otherwise face a threat of harm from the state defendants' future actions.").  Consistent with these cases, the Second Circuit has stated that "alleged injuries stemming only from past conduct *with no plausible threat of future violations* . . . do not fall within the *Young* exception to Eleventh Amendment immunity."  *Clark v. DiNapoli*, 510 F. App'x 49, 51 (2d Cir. 2013) (summary order) (emphasis added).

      This conclusion is, furthermore, consistent with the Supreme Court's admonition that *Young* distinguishes between cases "in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or directly to meet third-party interests such as compensation."  *Papasan v. Allain*, 478 U.S. 265, 277–78 (1986); *see also Green v. Mansour*, 474 U.S. 64, 68 (1985) ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.

But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.") (citation omitted).  In other words, the requirements that a complaint allege an "ongoing violation" and seek "prospective relief," although sometimes enumerated as separate elements, *see, e.g.*, *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007), are closely interrelated.  And the nature of the relief requested can shed light on whether the violation is ongoing.  *See Rowland*, 494 F.3d at 96 ("[I]t is relevant—in considering the existence *vel non* of an ongoing violation—to ask whether the claimed remedy is still available."); *Summit Med. Assocs.*, 180 F.3d at 1338 ("[T]he ongoing and continuous requirement merely distinguishes between cases where the relief sought is prospective in nature, *i.e.*, designed to prevent injury that will occur in the future, and cases where relief is retrospective.").

Here, as noted, the requested injunctive relief is prospective.  It does not relate to conduct that occurred in the past.  *Cf. Nat'l R.R. Passenger Corp. v. McDonald*, 779 F.3d 97, 102 (2d Cir. 2015) ("[T]akings are not an 'ongoing violation' of federal law. . . . What Amtrak considers an 'ongoing violation'—New York's entry onto and use of the land—is not even a violation of the law, because New York has legal title to it.").  Nor is it an attempt to obtain "compensation for past injuries."  *Eng v. Coughlin*, 858 F.2d 889, 896 (2d Cir. 1988); *cf. Ward v. Thomas*, 207 F.3d 114, 122 (2d Cir. 2000) ("[T]he ongoing ability of the subclass to recover for past underpayment does not change the retrospective nature of such relief.").  Rather, anticipating the "threat of future enforcement," it aims to "prevent injury that will occur in the future."  *Summit Med. Assocs.*, 180 F.3d at 1338.

The Court therefore holds that the FAC states a claim for an ongoing violation, such that, as pled, sovereign immunity does not bar Doe's claim for injunctive relief against Annucci.

Related, the Court notes that the parties dispute whether the June 4, 2014 modifications to Doe's parole conditions were final and irrevocable. Drawing all reasonable inferences in favor of the plaintiffs, as the Court must at this stage, the Court concludes that, much as they hope not to, plaintiffs could face adverse changes to Doe's parole conditions in the future. The possibility that DOCCS may again reverse course and impose a new separation order, to the detriment of Doe and his family, is particularly plausible given DOCCS's history, as pled, of arbitrarily enforcing, and changing, Doe's parole conditions. *See* pp. 10–12, *supra*. That said, if discovery reveals that the parole condition granting Doe unrestricted access to M.S. cannot be altered—that there is "no plausible threat of future violations," *Clark*, 510 F. App'x at 51—the factual underpinning of this holding will no longer apply, and the Court would then invite Annucci to move for summary judgment on the basis of sovereign immunity.

    **E.**    **Preclusion**

Federal courts recognize two types of preclusion: claim preclusion and issue preclusion. Under the doctrine of res judicata, also known as claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir. 1999) (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470, 476 (1998)) (emphasis omitted). Res judicata bars a later action when three conditions are met: "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000)) (alteration in original). Collateral estoppel, or issue preclusion, applies when an issue raised in a subsequent suit was

29

"actually and necessarily determined" in a prior litigation; this precludes a party from relitigating the same issue based on a different cause of action. *Montana v. United States*, 440 U.S. 147, 153 (1979). To determine whether a party is collaterally estopped from raising an issue, a court considers whether "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'" *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997) (quoting *Cent. Hudson Gas & Elec. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995)).

Annucci argues that Doe's claims are barred by claim preclusion and issue preclusion because Doe "is a member of the class in *Doe v. Overfield*," a class-action lawsuit filed in the Western District of New York. Annucci Br. 18. That is factually wrong. The complaint in *Overfield* defined the class as "all parents who are now or will be in the future on parole for a criminal offense *unrelated to sexual misconduct*, and who are prohibited by defendants from contact with their children, when both parents of these children support parental contact." No. 08 Civ. 6294, Dkt. 70, at ¶ 35 (emphasis added). Because Doe was convicted of rape and criminal sexual acts, FAC ¶ 24, he is, by definition, not "on parole for a criminal offense unrelated to sexual misconduct" and is therefore not a member of the *Overfield* class. Further, the *Overfield* class plainly does not include Jane Doe and M.S., who are also named as plaintiffs in this case. Annucci's motion to dismiss based on a claim of preclusion is therefore unavailing.

**F.  Abstention**

Following the decision in *Younger v. Harris*, 401 U.S. 37 (1971), federal courts may not enjoin "state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings

involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013) (quoting *New Orleans Pub. Serv., Inc. ("NOPSI") v. Council of City of New Orleans*, 491 U.S. 350, 367–68 (1989)). *Younger* abstention, however, is merited only in "exceptional" circumstances. *Id.* "[F]ederal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not 'refus[e] to decide a case in deference to the States.'" *Id.* (quoting *NOPSI*, 491 U.S. at 368).

Here, there is simply no ongoing state proceeding. Doe's criminal prosecution concluded in May 2005, FAC ¶ 24, and his administrative appeal was resolved shortly after Doe's suit was filed in this Court in April 2014, *id.* ¶ 87. Annucci may be correct that Doe could have brought his claims through an Article 78 proceeding in state court, *see* Annucci Br. 17–18, but the availability of that alternative forum does not provide a basis for dismissing or staying Doe's claims here. *See, e.g.*, *Zinermon v. Burch*, 494 U.S. 113, 124 (1990) ("'The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.' Thus, overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983.") (citation omitted); *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982) ("[E]xhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983.").

### G.     Failure to State a Claim

For the reasons discussed in Section III.C, *supra*, the Court holds that the FAC states a claim for violations of plaintiffs' substantive and procedural due process rights. The remaining question is whether the FAC adequately alleges the personal involvement of each moving defendant in those violations, so as to state a claim against that individual.

31

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). "A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986). A defendant is "personally involved" if he "directly participated in the infraction." *Id.* (collecting cases). "Direct participation" means "personal participation by one who has knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (citing *Gaston v. Coughlin*, 249 F.3d 156, 165–66 (2d Cir. 2001)). The personal involvement requirement is also satisfied where a parole officer is alleged to have "actually enforced" a parole condition, such as by arresting the parolee for a violation. *Farrell*, 449 F.3d at 484.

### 1.   Defendant Lima

As pled, Bureau Chief Lima was the primary driving force behind the constitutional violations. On August 6, 2013, "Lima instructed Senior Parole Officer Rosado to ensure that Mr. Doe immediately left [his family's] residence." FAC ¶ 53. Subordinate parole officers then carried out Lima's orders. *Id.* ¶¶ 54–55. Next, on October 2, 2013, Lima commenced an investigation regarding Doe's request to have contact with his son. *Id.* ¶ 62. On at least one occasion, October 7, 2013, Lima met with parole officers to discuss the investigation and give them instructions. *Id.* ¶ 63. Finally, on February 21, 2014, "Lima issued a one-paragraph determination denying Mr. Doe's request for contact with M.S." *Id.* ¶ 82, Ex. L.

These factual allegations, taken as true, are amply sufficient to establish that Lima was personally involved in the alleged constitutional deprivations.

### 2.   Defendants Cappiello, Rosado, and Valerio

Like Lima, Senior Parole Officers Cappiello and Rosado were central participants in the constitutional violations alleged here. On October 4, 2012, they "told Mr. Doe that, despite his completion of the NYCATS program, his release conditions barred him from residing with children under the age of 18, and that he therefore needed to move out of his family's apartment immediately." *Id.* ¶ 37. Whether Cappiello and Rosado made the decision to enforce Doe's parole condition in this manner or simply enforced a decision made by someone else, this allegation adequately pleads that these two officers were personally involved in the alleged constitutional violation. *See Farrell*, 449 F.3d at 484.

In addition, the FAC alleges that Officer Cappiello directed Doe to inform the Bronx Family Court of his parole condition, *id.* ¶ 41; and "oversaw" Scott's supervision of Doe from October 2012 to April 2013, during which time Cappiello periodically met with Scott "to discuss Mr. Doe's case, including his living situation," *id.* ¶¶ 42, 49. Based on these allegations, the Court can reasonably infer that Cappiello "contributed to" the decision to keep Doe and M.S. separated from October 2012 to February 2013, and the decision to again deprive Doe of contact with M.S. in August 2013. *See Barnes v. Ross*, 926 F. Supp. 2d 499, 508 (S.D.N.Y. 2013) ("[Defendant] was aware of, and contributed to, [the alleged constitutional violation]. This direct, personal involvement is sufficient to allege personal involvement.").

Further, the FAC alleges that by mid-2013, Officer Rosado "had taken over supervision of Mr. Doe['s] case" from Cappiello. *Id.* ¶ 51. In that capacity, on June 17, 2013, Rosado "instructed Scott to review the case to confirm that Mr. Doe was properly residing with his family." *Id.* On August 6, 2013, "Rosado informed Bureau Chief Lima that Mr. Doe was residing with his wife and child" and received instructions "to ensure that Mr. Doe immediately

left the residence." *Id.* ¶ 53.  Rosado also "oversaw the investigation," met with Valerio to "determin[e] whether the [parental contact] request should be approved," and "issued a report to [Lima] summarizing the results of the investigation." FAC ¶¶ 71, 79–80.  In light of these allegations, Rosado was, even more than Cappiello, actively personally involved in the alleged constitutional violations.

As to Officer Valerio, the FAC alleges that he replaced Scott as Doe's primary parole officer on September 10, 2013. FAC ¶ 56.  At that time, Doe was barred from living with his family or having any contact with M.S. *See id.* ¶¶ 53–55.  In his capacity as Doe's parole officer, Valerio had significant authority, including to approve Doe's request "to reside alone in a studio apartment." *Id.* ¶ 73.  He also participated in the investigation. *Id.* ¶¶ 68–72.  And, critically, he met with Rosado on December 9, 2013 to "determin[e] whether the [parental contact] request should be approved." *Id.* ¶ 79.  Accordingly, as alleged, Valerio had power over Doe's living situation and was one of the relevant decision makers assessing the no-contact order; he was therefore personally involved in the constitutional violations.

### 3.    Defendants Rennie Rodriguez and Rebecca Rodriguez

In contrast to the other parole officers, Officers Rennie and Rebecca Rodriguez were involved only in the investigation. *See id.* ¶¶ 17–18, 71–72.  Concretely, they contacted and interviewed witnesses, searched for and reviewed records, and received information. *See id.* ¶ 72.  But the FAC does not allege that the investigation itself was somehow improper.  Nor does it allege that Rennie or Rebecca Rodriguez made a recommendation regarding Doe's contact with M.S., participated in a meeting in which a decision as to that issue was made, enforced the decision to separate Doe and M.S., or otherwise contributed to the constitutional violations. Accordingly, Rennie Rodriguez and Rebecca Rodriguez were not personally involved in the

violations alleged. *Compare Barnes*, 926 F. Supp. 2d at 508 (finding personal involvement where defendant "was aware of, and contributed to" the allegedly unconstitutional treatment), *and Pugh v. Goord*, 571 F. Supp. 2d 477, 514–15 (S.D.N.Y. 2008) (finding personal involvement where defendant "was consulted" and "espoused views" that led to the creation of the allegedly unconstitutional policy), *with Vogelfang v. Capra*, 889 F. Supp. 2d 489, 503 (S.D.N.Y. 2012) (finding no personal involvement where defendants were not "involve[d] in any event which constituted a violation of [plaintiff's] rights"), *and Odom v. Calero*, No. 06 Civ. 15527 (LAK) (GWG), 2008 WL 2735868, at *6–7 (S.D.N.Y. July 10, 2008) (finding no personal involvement where defendant reviewed an administrative determination). The claims against these two defendants therefore must be dismissed.

### 4.    Defendant Annucci

Defendant Annucci is sued only in his official capacity, as Acting Commisioner of DOCCS, and plaintiffs seek only injunctive relief against him. Accordingly, plaintiffs are not required to establish that Annucci was personally involved in the alleged constitutional violations. *See Farid*, 593 F.3d at 249 ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to *an award of damages* under § 1983.") (citation omitted) (emphasis added). Instead, the relevant question is whether Annucci "has the authority to perform the required act." *Zappulla v. Fischer*, No. 11 Civ. 6733 (JMF), 2013 WL 1387033, at *10 (S.D.N.Y. Apr. 5, 2013) (quoting *Briscoe v. Rice*, No. 11 Civ. 578 (JFB) (ETB), 2012 WL 253874, at *4 (E.D.N.Y. Jan. 27, 2012)). As the "head" and "chief executive officer" of DOCCS, N.Y. Corr. Law §§ (1)–(2), Annucci has authority to enforce an injunction issued against that Department.

Annucci objects that the New York State Board of Parole is independent from DOCCS. *See* N.Y. Exec. Law §§ 259-b, 259-c.  This argument is unavailing.  Plaintiffs do not challenge the imposition of the special parole condition by the Board of Parole; rather, they challenge the application and enforcement of that condition by the individual parole officers discussed above. Annucci thus "has the authority to perform the required act," *Zappulla*, 2013 WL 1387033, at *10, namely, to prevent the unconstitutional implementation of a parole condition by the parole officers who work under him.

## CONCLUSION

For the foregoing reasons, the motions to dismiss are granted as to Rennie Rodriguez and Rebecca Rodriguez, and denied as to all other defendants.  The Clerk of Court is respectfully directed to terminate Rennie Rodriguez and Rebecca Rodriguez as defendants in this case, and to terminate the motions pending at docket numbers 112, 116, 119, and 141.  An order as to next steps in this case will issue shortly.


SO ORDERED.

Paul A. Engelmayer
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: July 15, 2015
        New York, New York