# Exhibit 6

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------
JOHN DOE and JANE DOE, Individually
and on Behalf of M.S., an Infant,
as Next Friends,

                Plaintiffs,    Civil Action No.
                            14-CV-2953 (PAE)

         vs.

ANTHONY ANNUCCI, Acting Commissioner of the
New York State Department of Corrections and
Community Supervision; TINA STANFORD,
Chairwoman of the New York State Board of Parole;
WILLIAM HOGAN, Regional Director of New York State
Department of Corrections and Community Supervision;
JOSEPH LIMA, Bureau Chief of the Manhattan VI Area
Office of the New York State Division of Parole;
TERRANCE X. TRACY, Counsel for the Board of Parole;
PAROLE OFFICER EMILY SCOTT; PAROLE OFFICER SIMON
VALERIO; PAROLE OFFICER REBECCA RODRIGUES; PAROLE
OFFICER RENNIE RODRIGUES; SENIOR PAROLE OFFICER FNU
ROSADO; PAROLE OFFICER FNU MERCEDES,

                Defendants.
------------------------------------------------
    VIDEOTAPED DEPOSITION OF JAMES CAPPIELLO
          New York, New York
        Wednesday, May 4, 2016

Reported by:
THOMAS A. FERNICOLA, RPR
JOB NO. 106292

Wednesday, May 4, 2016

10:00 a.m.


VIDEOTAPED DEPOSITION of JAMES CAPPIELLO, held at The Law Offices of Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York, before Thomas A. Fernicola, a Registered Professional Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:


DEBEVOISE & PLIMPTON

Attorneys for the Plaintiffs

919 Third Avenue

New York, New York  10022

BY:  NATHAN RICHARDS, ESQ.

BLAIR ALBOM, ESQ.


LIPPES, MATHIAS, WEXLER, FRIEDMAN

Attorneys for Defendants Lima and Valerio

54 State Street

Albany, New York  12207

BY:  JEFFREY MANS, ESQ.

A P P E A R A N C E S (Cont'd):

NYS DOCCS
Attorneys for Defendants
    Harriman Campus
    Albany, New York  12226
BY:  NOT PRESENT


HAMMOCK & SULLIVAN
Attorneys for Defendant Parole Officer
FNU Rosado
    154-08 Northern Bouevard
    Flushing, New York  11354
BY:  EDWARD HAMMOCK, ESQ.
    DONNA SULLIVAN, ESQ.

A P P E A R A N C E S (Cont'd):

ROTHMAN, SCHNEIDER, SOLOWAY & STERN

Attorneys for the Witness

100 Lafayette Street

New York, New York  10013

BY:  ROBERT SOLOWAY, ESQ.

ALSO PRESENT:

SHA-LA HOLLIS, Legal Video Specialist.

                    J. Cappiello

case conference with all the parole officers.

    Q    Did you do anything other than that?

    A    I was familiar with all the officers
from before from previous, I should say.

    Q    All the parole officers you mean?

    A    Yes.

    Q    And how were you familiar women?

    A    From my years in training, training
as -- I'm very familiar with the people that
come to the classes.

    Q    And with respect to specific
parolees, did you speak with any of these
parolees' prior parole officers or senior
parole officers?

    A    I don't recall that, no.

    Q    While you were in Manhattan 6 as
████████████  senior parole officer, did you
become aware that he and his wife had a
newborn son?

    A    Yes.

    Q    And how did you learn that?

    A    I believe it was in early October
during that case conference.

    Q    And was this the case conference

J. Cappiello

that you had mentioned earlier today?

    A    I believe so, yes.

    Q    The one with Scott and Rosado and yourself?

    A    Yes.

    Q    You had said at least that case conference was an informal one, it had not been previously scheduled; correct?

    A    It was informal in the sense that it had not been previously scheduled, yes.

    Q    And you said that Parole Officer Scott asked for SPO Rosado to join that case conference; is that correct?

    A    No, sir.

    Q    Can you explain again then how the case conference between the three of you came about in October?

    A    Scott was already talking to Rosado about the case, you know, as far as I can remember.  And I believe it was Mr. Rosado's good judgment that, since I was now the senior, to involve me in the conversation.

    Q    And how did he involve you in the conversation?

J. Cappiello

There may have been some other sexual-related ones.

Q    Did you take any notes or write anything about this conversation?

A    No, I don't believe so, no.

Q    Did you speak about this discussion with anyone else other than SPO Rosado and PO Scott?

A    Later that day, I was in part of another conversation with Mr. Rosado and Mr. Lima outside in front of the building.

Q    And at that conversation you talked about ███████'s case?

A    Yes.

Q    And what did you say?

A    After ███████ left the office or after his office report was concluded, apparently he had either tried to call Mr. Lima or tried to get the secretary to get his attention.

Somehow or another, Mr. Lima was aware that ███████ wanted to, I assume, review the decision, go over our head, so to speak, to appeal it.

J. Cappiello

Q    How did you know that?

A    Mr. Lima had come to us and said, "Before I talk to this guy, what's going on?"

Q    So you and Rosado were having a conversation when Lima approached the two of you?

A    I believe -- I can't specifically recall.  I recall it happening out in front of the building.  And Mr. Lima found us.  I'm not sure what Rosado and I were doing before.

Q    What did you say in response to Mr. Lima's questions about the case?

A    We discussed the criminal history. We discussed the same things we had told ███████ in the office, about the criminal history, the SARA requirements, the treatment requirement, what had happened with the case.

Q    Just to clarify, you had said before this meeting you hadn't reviewed ████████'s criminal history but that it came up during the meeting?

A    I believe that's when I first heard of it, yes.

Q    Do you recall who brought it up

J. Cappiello

during the meeting?  I'm referring to the meeting with Scott and Rosado.

A     I understand.

I don't.  It would be just a normal course of reviewing the case.  It might be in the computer.  It might be in a file.  Scott may have known it already in her head.  I'm not sure how it came up.

Q     What did Lima say in response to you discussing with him ▮▮▮▮'s case?

A     In essence, that he felt that we had made the right decision.  And I don't believe he was going to entertain or listen to ▮▮▮▮▮▮'s appeal.  I believe that was -- after he had heard what he wanted, then that was it.

Q     So he said to you that he was not going to speak with ▮▮▮▮?

A     I can't recall him specifically saying that, but I believe that was the outcome.

Q     So, to your knowledge, he never did speak with ▮▮▮▮?

A     As far as I know, no.

J. Cappiello

Q       What did Rosado say during this conversation with Lima?

A       I can't say specifically.  Again, in essence, what I was saying before, about the criminal history and why we did what we did, and why we thought what we thought.

Q       Did Lima give you any instructions during this conversation?

A       I don't believe there was anything to give instructions on.  I think he was in agreement with our decision.

Q       I'm going to hand to you a very large document that was used as an exhibit during a previous deposition introduced by defendants.  I just want to direct your attention to what's Exhibit B in that.

Do you recognize this document?

A       In general, yes.

Q       Were any of these special conditions that are listed in this document -- are any of these the ones that you went over with ███████ in this October meeting between you, Rosado, Scott and him?

A       We may have gone over all of them.

J. Cappiello

There were some that stuck out in my mind earlier.

Q      I'll draw your attention to No. 13. Does that refresh your recollection if you discussed that with            ?

A      Yes.

Q      Yes, it does refresh your recollection?

A      Yes, it does.

Q      As part of this meeting that you had with        in October, did you ask him to sign any statements asserting additional conditions?

A      Ms. Scott may have imposed a residency restriction on him that he signed for that day.  I can't say 100 percent.

Q      Let me direct your attention to what's marked as Exhibit E, and we'll get counsel a copy.

        Have you had a chance to look at this document?

A      Yes, sir.

Q      And is this familiar to you?

A      It's familiar in that it is a

J. Cappiello

special condition.  I can't say I have an independent memory of it being from that day, but it's familiar.

Q    So, to your knowledge, when you referenced PO Scott asking him to sign additional conditions, are these the additional conditions that you referenced?

A    Yes.

Q    Did ▮▮▮▮▮▮ sign this in your presence?

A    I can't say one way or the other, sir.  I don't know.

Q    Did Parole Officer Scott ask ▮▮▮▮▮▮ to sign this at your instruction?

A    The imposition of the condition was at my instruction.  So it's standard that they sign it, yes.

Q    Why did you ask PO Scott to have ▮▮▮▮▮▮ sign this?

MR. SOLOWAY:  I object to the form. Do you mean why did he direct her to impose the conditions?

MR. RICHARDS:  Exactly, yes.  Sorry, I'll rephrase.

J. Cappiello

BY MR. RICHARDS:

Q    Why did you ask PO Scott to impose these conditions on ██████?

A    To further reinforce the condition that had already been imposed about not being in contact with kids.

Q    Did SPO Rosado give PO Scott any instructions in connection with the October case conference?

A    This case conference on October 4?

Q    Yes.

A    I don't believe so.  I was Ms. Scott's supervisor so it would come from me.

Q    And following this case conference, did you have any follow-up conversation with PO Scott about ████████'s supervision?

MR. SOLOWAY:  Any time?

MR. RICHARDS:  In reference to this October conversation.

MR. SOLOWAY:  I'll just object to the form.  If you understand, you can answer.

A    Can you ask it again, please?

J. Cappiello

A    That would be a decision we would have to make.  I couldn't say conclusively he wouldn't be, but it would be a decision we'd have to make.

Q    When you said previously based on the condition that the PO had imposed him, ███████, did you mean that the Board of Parole condition prohibited ████ from having contact with his son without obtaining a visitation order?

A    No.  I said none at all, if I recall.

Q    Do you mind again looking at --

A    Yes, what was it?

Q    Exhibit B.

A    Exhibit B, what number was it, sir?
      "I will have no contact without the written permission of the supervising parole officer."  So, no, none is none.

Q    Unless given the written permission of the supervising parole officer; correct?

A    Correct.

Q    And a supervising parole officer could give that written permission without a

J. Cappiello

visitation order from Family Court; correct?

A    Yes.

Q    Could you just briefly describe during this October case conference in which the decision was made to deny parental contact, could you briefly describe the basis for that decision?

MR. SOLOWAY:  Objection to form. And he has already answered that, but I'm not directing him not to answer.

A    Your question is what did we base that decision on?

Q    Yes, exactly.  I'll rephrase it.

The decision that was made at the October case conference that you said that you made jointly with Scott and Rosado to ask ███████ to leave the home and not have contact with his newborn son, on what was that decision based?

MR. SOLOWAY:  Same objection. Again, you can answer, if you understand.

A    As I said earlier, the Board of Parole thought it would be important.

I would also say that ████████'s

                    J. Cappiello

thinking of?

     A     It would be very difficult.  I would
have no way of knowing until it was brought to
my attention.

     Q     To your knowledge, was ██████████'s
wife, ████████, contacted before the October
case conference in which ███ was told he had
to leave the home?

     A     I don't know if she was contacted at
all for any reason.

     Q     Did you instruct anyone to contact
her after the October 4 decision?

     A     I don't believe so, no.

     Q     To your knowledge, did anyone at
DOCCS contact her?

     A     I don't believe so.  I don't know.

     Q     To your knowledge, did she support
parental contact between ████████ and his
son?

     A     I don't have any knowledge of
anything she ever said.

     Q     Okay.
           Did you seek input from ████████
at this October conference before decided to

J. Cappiello

not permit him contact with his newborn son?

A    He asked many times why, why are we doing this.  Why are we doing this to him.  I don't recall asking him for his opinion on whether that was a good idea or not.

Q    Did you instruct anyone else to seek input from ████████ with respect to parental contact with his newborn son?

A    I don't believe so.

Q    Did you provide ████████ with a time and place in which he could contest this decision to not permit him contact with his newborn son?

A    I don't believe I did, no.

Q    To your knowledge, did anyone else provide him a time when he could contest the decision?

A    A time?

Q    A place or some way in which he could argue against the decision?

A    I don't believe I did, no.

Can you ask the question again?

Q    I'm sorry.

I asked if, to your knowledge, did

J. Cappiello

anyone else provide him this opportunity to contest the decision to not have contact with his son?

A    No, but he did take it upon himself, on his own to try to appeal it to Mr. Lima, like I referenced earlier.  Somehow he knew to go above us.  I don't know how he found out about that.

Q    But you had said that Lima did not speak with him?

A    I don't believe he did.

Q    Did you instruct Parole Officer Emily Scott to contact NYCATS regarding ███████████  in October of 2012?

A    I'm not sure.  Perhaps, I'm not sure.

Q    Could you direct your attention to Plaintiff's Exhibit 1?  It was ██████████'s chrono at the top of page DOCCS 251.

Do you see an entry by dated October 4, 2012?

A    October 4?

Q    Yes, at the top of the page.

A    Yes.

J. Cappiello

A    She may have she's a good PO.  I mean, she ordinarily would follow up on things.  I don't know for sure.

Q    But it was your understanding from this conversation that that was what she was intending to do?

A    Yes.

Q    Following the October case conference with ▇▇▇▇▇▇ in which he was told he'd have to leave his home, did you instruct PO Scott to investigate whether ▇▇▇▇▇▇ should, in fact, be permitted contact with his newborn son?

A    I have no recollection of an instruction, but that's everything that you've been talking about so far.  Going to the Family Court, going to ACS, that was an exploration; it was an investigation.

Q    And the purpose of that investigation was to determine whether or not ▇▇▇▇▇▇ should be permitted contact with his newborn son?

A    Or not.

Q    Was the purpose of that

J. Cappiello

investigation also related to contact with his 14-year-old daughter?

A    He had a requirement to have contact with no kids under 18, so, yes.

Q    Besides obtaining the court records for these two visitation requests that we've discussed with respect to his son and daughter, did you instruct Emily Scott to do anything else in terms of investigating contact with ▮▮▮▮▮▮▮ and his son?

A    I didn't instruct her to do those things that we discussed, that I can remember, but those are the two things that come most to mind that she was looking into.

Q    Are you aware of anything else that she did in terms of this investigation and exploration as you've described it?

A    No, I'm not.

Q    I'm sorry, just to clarify, this sort of this investigation into whether there should be contact between ▮▮▮▮▮▮▮ and his son, you said you did not instruct PO Scott to do this.  This was something that she was doing on her own?

J. Cappiello

MR. SOLOWAY:  Objection.

A     That's not at all what I said.

Q     Sorry, can you clarify?

A     I don't know how else I could say it any differently.  I was aware of it.  I thought it was a good idea.  I can't say I instructed her that she had to do it.

Q     To your knowledge, did Parole Officer Scott notify ████████ that she was looking into this matter?

A     I don't know if she did or not.

Q     Did you instruct her to do so?

A     I did not.  I don't believe I did.

Q     Can you direct your attention back to Plaintiff's Exhibit 1, the chrono, please. And can you turn to page DOCCS 248?

A     Okay.

Q     And I direct your attention almost all the way down the page to an entry from October 22.

A     Yes.

Q     That has your name as the "entered by"?

A     Yes.

J. Cappiello

living at his family home in the Bronx.

Q    So when did he move back into the Bronx?

A    That's a good question.  I don't know, sir.

Q    How did you learn that this request for transfer to the Bronx was rejected?

A    Mr. Lima came into my office to tell me what's going on with this case.

Q    What did you say in response?

A    I didn't know.  That I would look into it, and I looked into it.

Q    And what did you do when you looked into it?

A    I had realized that had we had -- at the time there was a conference in April, and Scott told me that this person was living with his family in the Bronx.  So I told her to transfer the case to the Bronx.

Q    Okay.

At that time were you aware that ███ was residing with his newborn son?

A    No, sir.

Q    I'm sorry, at the April conference

J. Cappiello

that you mentioned, you did not know that?

A    I did not know.

Q    Going back to the conference you had with Lima, do you recall when that was that he came into your office?

A    Some time in the middle of April.

Q    After you had reviewed ███████'s case file, did you continue your conversation with Lima?

A    I did.

Q    And what did you say to him?

A    I said a number of things.  I said that there was a lot going on in the bureau at that time.  I was getting ready to move to my new assignment so I was taking care of a lot of tying up loose ends.

     I told him that, which he had already known, there an agency-wide push to get out of area cases transferred.  So that when I had done my April conference, all I was looking for was for people who lived out of area to tell the POs to transfer them.

     ███████'s case was one of them. It was one among many.  Scott said he is with