# Exhibit 7

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
JOHN DOE and JANE DOE, Individually
and on Behalf of M.S., an Infant,
as Next Friends,
                    Plaintiffs,    Civil Action No.
                                   14-CV-2953 (PAE)
                v.
ANTHONY ANNUCCI, Acting Commissioner
of the New York State Department of
Corrections and Community Supervision;
TINA STANFORD, Chairwoman of the
New York State Board of Parole;
WILLIAM HOGAN, Regional Director of New York
State Department of Corrections and
Community Supervision; JOSEPH LIMA,
Bureau Chief of the Manhattan VI Area
Office of the New York State
Division of Parole; TERRANCE X. TRACY,
Counsel for the Board of Parole;
PAROLE OFFICER EMILY SCOTT;
PAROLE OFFICER SIMON VALERIO;
PAROLE OFFICER REBECCA RODRIGUES;
PAROLE OFFICER RENNIE RODRIGUES;
SENIOR PAROLE OFFICER FNU ROSADO;
PAROLE OFFICER FNU MERCEDES,
                    Defendants.
----------------------------------------X

                DEPOSITION OF JOSEPH LIMA
                   New York, New York
                    May 24, 2016

Reported by:
MARY F. BOWMAN, RPR, CRR
JOB NO. 106288

May 24, 2016

10:45 a.m.

Deposition of JOSEPH LIMA, held at the offices of DEBEVOISE & PLIMPTON, LLP, 919 Third Avenue, New York, New York, before Mary F. Bowman, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New Jersey.

APPEARANCES:

For Plaintiffs:

Blair Albom, Esq.

Nathan Richards, Esq.

Debevoise & Plimpton

     919 Third Avenue

     New York, NY 10022


For Defendants Lima and Valerio:

Jeffrey Mans, Esq.

Lippes, Mathias, Wexler, Friedman

     54 State Street

     Albany, NY 12207

///

APPEARANCES:


For Defendant Capiello:

Robert Soloway, Esq.

Rothman, Schneider, Soloway & Stern

   100 Lafayette Street

   New York, NY  10013



For Defendant Rosado:

Edward Hammock, Esq.

Donna Sullivan, Esq.

Hammock & Sullivan

   154-08 Northern Boulevard

   Flushing, NY  11354

Page 60

LIMA

transferred that were out of area cases and

███████'s name came up because he was one

of the those cases.  My parole officers

attempted to make the transfer and they

pointed out that there was an issue in the

household.

Q.    When you say they, who is they?

A.    That would be the parole officer

and the senior on the receiving -- for the

receiving bureau.

Q.    When you say they pointed out

there was an issue in the household, what

do you mean by that?

A.    That the residence was not in

compliance with the parolee's conditions

not to be in contact with minors.

Q.    Did you speak with BC Young

directly about this issue?

A.    I believe I did.

Q.    Did BC Young tell you that the

residence was not in compliance with the

parolee's conditions?

A.    I believe he did.

Q.    Was this the first time that you

LIMA

were made aware that ███████ had been living with his child?

A.    I believe so, yes.

Q.    I should ask you, when you say that the residence was not in compliance with the parolee's conditions, how was it not in compliance with the parolee's conditions?

A.    I believe I indicated he had a condition not to be in contact with minors without the permission of his parole officer.

Q.    And what contact was he having with minors at the time?

A.    I believe there was a minor living in the residence at the time.

Q.    That was his son?

A.    Yes.

Q.    At that time, did you have an understanding of why ███████ had been living with his son?

A.    I'm not sure I understand the question.

Q.    At the time that you -- that BC

                    LIMA

the parolee chrono report?

    A.    It was not.

    Q.    When you say there is not a
tremendous amount of latitude with respect
to the parole condition, what did you mean
by that?

    A.    Basically when an individual --
and I'm talking in general terms -- has a
board-imposed condition, generally if you
were to modify that, you would go to the
board of parole asking them to modify that.

          The fact of the matter is, going
back to the late '90s, the agency had
really taken a complete U-turn in the
supervision of sex offenders in order to
protect society in general.

    Q.    ███████'s parole condition
provided that he could have contact with
minors if his parole officer agreed, is
that accurate?

    A.    Technically, yes.

    Q.    So he would not -- what do you
mean by technically?

    A.    Technically, the protocol, there

LIMA

would not be very many parole officers who would independently make that decision.

Q.    Why not?

A.    Simply because, as we discussed earlier, you know, the potential accountability if this decision were to have negative consequence.

Q.    By --

A.    In most situations, parole officers would conference it with their senior.  If they felt it was of a sufficient concern, they would then include the bureau chief.

Q.    But according to the condition itself?

A.    The condition itself, yes, that's why I said technically.

Q.    So the parole -- just to make sure I understand, the parole officer could take this question to a senior parole officer and to a bureau chief, but they are not required to do so?

A.    The protocol would be that they would involve their senior.  That would be

LIMA

the protocol.  That would be the practice.

Q.   Is there a distinction between protocol and practice?

A.   A difference between protocol and practice?

Q.   I'll rephrase that.

Is it written down somewhere that this is something that a parole officer has to conference with the senior parole officer?

A.   No.

Q.   It's just good practice?

A.   It's common sense.

Q.   But if a parole officer were to make this determination on his or her own, that would be permissible?

A.   I'm not sure I would see the term as being permissible.  I mean, the reality is is that, again, we are dealing in a world of consequences for decisions made.

If a parole officer made that decision independently, their level of potential accountability would be significantly higher if they made that

LIMA

decision independently.

Q.    But they have the authority to make that decision?

MR. MANS:  Objection to form.  I think he has already answered the question.

MS. ALBOM:  Are you instructing him not to answer?

MR. MANS:  No, I think he has already answered it.  He testified that it is not something that the parole officer should do according to protocol.

So you are asking now do they have the authority to do it.  I think he has already testified that according to protocol, they don't or they shouldn't do it.

MS. ALBOM:  Well, he said that best practices would be to discuss this with a senior parole officer.

MR. RICHARDS:  Let's let him answer the question.

MR. MANS:  Again, you can answer

LIMA

Q.    Is there any rule requiring a parole officer to first obtain permission from a senior parole officer or a bureau chief before permitting a parolee with a no contact provision to have contact with a minor under the age of 18?

A.    I believe there is no written rule.

Q.    Going back to Plaintiff's 1, the page ending in 240, the entry second from the bottom where you informed at least SPO Rosado that ▇▇▇▇ was to be removed from his home, what was the basis for your instruction?

A.    Based on the substance -- subject's instant offense and the board-imposed condition, there did not appear any reason to waive the board-imposed condition.

Q.    Other than the nature of the instance offense and the board-imposed condition, was there anything else that you considered when giving this instruction to Senior Parole Officer Rosado?

LIMA

A.    I don't think so.

Q.    At this time, did you discuss _____'s case with Parole Officer Scott?

A.    I don't recall.

Q.    If the condition to which _____ is subject permitted contact upon the written permission of his parole officer, why did the condition need to be waived to permit contact?

A.    The view of the agency would be even though it says -- and that's why I have been going back and forth on this issue of practice and protocol.  The condition would be we modified that condition by allowing _____ to live there under those circumstances.  That would be the question I would be asked at a later point in that worst possible case scenario.  That's why we have been going around on this issue.

Q.    When you say worst possible case scenario, what do you mean by that?

A.    Worst possible case scenario would be that _____ molested his child

LIMA

and was arrested or that was somehow brought to the attention of -- that horrible offense occurring.

Q.    Under what circumstances would you be discussing this issue with your seniors, with your supervisors?

A.    With my supervisors, with my regional director?

Q.    Yes.

A.    More than likely, it would be a scenario if I were going to be making a decision that was outside the box, if you will, that I wanted to then include potentially his support in that decision.

Q.    We have been talking about -- you said the question I would be asked at a later point in that worst possible case scenario.  Would you have only been asked these questions if the worst case scenario occurred?  Or would this decision have been reviewed by your superiors in a nonevent?

A.    Only in a nonevent if somehow it came to the attention of the chain of command.

LIMA

Q.    When you said that the view of the agency -- you had referred to the view of the agency.  Whose view?

A.    I mean, the bottom line is that any time there is an event that -- again, occurs in a public situation that people are looking at, that event is intensively investigated and decisions are questioned as to why, particularly on Monday morning, you made these decisions.

Q.    Did someone specifically at DOCS communicate this view to you?

A.    I work for the State of New York for 43 years, OK.  In 43 years, that has been my entire life experience working with the agency, with the various agencies I worked with.

Q.    Mr. Lima, your testimony was that you didn't recall discussing ████████'s case in August of 2013 with PO Scott once you were informed that ████████ was still residing with his child?

A.    I don't recall specifically, no.

Q.    I am showing you a document that

LIMA

with Mr. Cappiello was also outside the building or was it when you returned?

A.    It was probably later on when I returned.

Q.    Did you provide any instruction to Mr. Cappiello regarding ████████'s request for parental contact?

A.    At the point of requesting for parental contact came in, Mr. Cappiello was no longer in the bureau.

Q.    I am sorry, I was not clear.

You testified that ████████ expressed he was upset outside of the building.  After you -- did he ask you to do anything in connection with his ability to contact his son at that time?

A.    Well, he expressed his concern and that he wanted contact with his son.  I said, as I would under most of those circumstances, I'll take a look at it.  But I didn't make any commitments one way or the other because I didn't know all of the details regarding the case.

Very often people ask me

LIMA

questions on limited information and then want to hold me accountable to that answer.

Q.    And as a result of the conversation that you had with ███████, you then spoke to Mr. Cappiello, is that right?

A.    Yes.

Q.    Did you provide any instructions or guidance to Mr. Cappiello at that time?

A.    I believe I probably agreed with Mr. Cappiello, that ███████ could not continue in the residence he was in.

Q.    Was there any discussion of conducting an investigation into whether ███████ should have --

A.    There was no parental protocol at that time.

Q.    Even if there was no parental contact protocol, would DOCCS be in a position to assess whether or not a parolee should have parental contact?

A.    Well, the reason why the parental protocol came in effect was because folks, particularly upstate, decided that somebody

LIMA

who wasn't even a sex offender shouldn't have contact with their children.

The fact is that, generally speaking, many parole officers and parole staff are going to err on the side of safety, rather than make a decision that they could later on be held accountable for having made what, in hindsight, would be considered a very questionable decision.

Q.   To your knowledge, did Mr. Cappiello conduct an investigation into whether ████████ should have contact with his son?

A.   I have no idea.

Q.   What was the basis for your agreement with Mr. Cappiello's decision in the conversation that you referenced?

A.   Looking at it from a cursory standpoint, not as in depth-ly (sic) as I looked at it for the parental notification, ████████ committed an interfamilial crime regarding a minor and he had a board-imposed condition not to have contact with somebody under the age of 18.

LIMA

Q.    So is it fair to say that the basis for your decision was his criminal history and the board condition?

A.    I would probably say crime of conviction rather than simply criminal history.  This is actively what he was on parole for.  It is not something that occurred 20 years earlier.

Q.    But other than the instant offense and the condition, anything else you considered at that time?

A.    That's what I can recall.

Q.    Other than the communications that we have already discussed, did you ever have any communications about ███████ with Mr. Rosado?

A.    Other than the ones discussed?  I don't believe so.

Q.    And same question with respect to Ms. Scott?

A.    Yeah, I don't believe so.

Q.    And up to today, excluding the communications that we have already discussed, did you have any conversations