UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

JOHN DOE and JANE DOE, Individually and on behalf
of M.S. an Infant, as Next Friends,

                                        Plaintiffs,

                  -v-

JOSEPH LIMA, Bureau Chief of the Manhattan VI Area
Office of the New York State Division of Parole; Parole
Officer EMILY SCOTT; Parole Officer SIMON
VALERIO; Senior Parole Officer RICHARD ROSADO;
and Senior Parole Officer JAMES CAPPIELLO,

                                        Defendants.

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8-31-17

14 Civ. 2953 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case, now at the summary judgment stage, involves claims that state parole officials,

in portions of 2012, 2013, and 2014, unconstitutionally deprived plaintiff John Doe ("Doe") of

access to his infant child. Doe earlier had been convicted of sexual offenses against a teenage

girl, for which he served more than eight years in prison. After Doe's release from prison on

parole, his wife, Jane Doe, gave birth to their son, M.S. After defendants—parole officials at the

New York State Department of Corrections and Community Supervision ("DOCCS")—learned

of the birth of Doe's son, they applied one of Doe's special parole conditions to bar him

categorically, during two distinct time periods, from having any contact with his infant son.

Together, these two periods lasted close to 13 months.

Following discovery, plaintiffs—Doe and Jane Doe, individually and on behalf of M.S.—

now move for summary judgment under Federal Rule of Civil Procedure 56 as to liability against

the five defendants who remain in this case. Three defendants—Joseph Lima, Simon Valerio,

and Richard Rosado—in turn move for summary judgment in their favor, primarily on grounds of qualified immunity and a lack of personal involvement.

For the following reasons, the Court grants plaintiffs' motions for summary judgment as to liability as to each defendant, and denies defendants' motions.

## I.  Background[1]

### A.  Factual Background

#### 1.  Doe's Family Overview

Doe is the biological father of M.S. and the husband of Jane Doe, the biological mother of M.S.  JSF ¶¶ 1–2.  John and Jane Doe, a woman John Doe has known for more than 25 years, Albom Decl, Dkt. 236, Ex. 1, ¶ 3, were married in September 2007, JSF ¶ 11.  M.S. was born in September 2012.  *Id.* ¶ 3.  Since September 2013, Doe has worked full-time for a Manhattan-based company that provides live and artificial foliage for special events.  *Id.* ¶ 13.  Since 2006, Jane Doe has worked at a legal secretary for a large law firm in Manhattan.  *Id.* ¶ 15.

Doe had previously been married, between 1988 and November 2005, to Beverly Martin. *Id.* ¶ 10.  He is the father of eight children with five women: four with ex-wife Martin; one with Jane Doe (M.S.); and three with three other women.  *Id.* ¶ 12.  His children are two daughters born in 1986; a son born in 1990; a daughter born in 1993; a son born in 1997; a daughter born in

---

[1] The Court draws its account of the underlying facts from the parties' Joint Statement of Undisputed Facts, Dkt. 229 ("JSF"), and its attached exhibits; Plaintiffs Rule 56.1 Statement of Undisputed Material Facts, Dkt. 234 ("Pl. 56.1"), and defendants' response, Dkts. 246-2, 269; defendants Lima's and Valerio's Rule 56.1 Statement of Facts, Dkt. 268 and defendant Rosado's Statement Pursuant to Rule 56.1, Dkt. 246-1, and plaintiffs' responses to each, Dkts. 273–74; and attached exhibits.  The Court also reviewed the declarations submitted by counsel and their attached exhibits, *see, e.g.*, Dkts. 236, 258, 267.  The Court has reviewed all exhibits submitted by the parties in the various declarations by counsel.  When the Court cites to a Rule 56.1 statement, it does so for facts or for parts of facts that are undisputed or substantively undisputed by either plaintiffs or defendants.

1998; a daughter born in 1999; and M.S., born in September 2012. *Id.* There is no evidence that Doe ever abused or mistreated his children. Pl. 56.1 ¶ 12.

### 2. Doe's Rape Conviction and Criminal Record

On October 18, 2004, Doe was convicted after a jury trial in New York State Supreme Court, Bronx County, of one count of rape in the second degree, one count of sodomy in the second degree, and one count of endangering the welfare of a child. JSF ¶ 16. On May 11, 2005, Doe was sentenced to consecutive terms of imprisonment for three and a half to seven years and two to six years. *Id.*

Before his trial and conviction, Doe resided with his then-wife, Martin, their four children, and Martin's niece. *Id.* ¶ 17. The complaining witness in Doe's rape case was Martin's niece, who testified at Doe's trial that Doe had engaged in vaginal and oral sex with her in 2002 and 2003 when she was 13–14 years old. *Id.* Doe has asserted his innocence of these charges, Pl. 56.1 ¶ 18; for reasons that the record does not make clear, his criminal conviction remains today on direct appeal, *see* JSF ¶ 18.

Doe has other criminal convictions and an incident of domestic violence. On January 22, 1981, as a juvenile offender, he pleaded guilty to robbery in the first degree and was sentenced to 28 months to seven years of imprisonment. *Id.* ¶ 22. On April 4, 1988, he pleaded guilty to two counts of robbery in the first degree and was sentenced to concurrent terms of six to 12 years of imprisonment. *Id.* ¶ 21. In addition, in connection with his arrest leading to his 1988 conviction, he provided law enforcement officers with his mother's maiden name as his last name and with an incorrect birth year (1968 instead of 1965), for the purpose of impeding the police's ability to identify him. *Id.* ¶ 23. Finally, in 2000, Doe shoved or pushed Martin during a "scuffle" and she

fell to the ground; as a result, Martin went to Lincoln Hospital in the Bronx to seek medical care. *Id.* ¶ 24.

### 3. Doe's Initial Parole Supervision and Special Condition 13

Doe served more than eight years of his sentence for his 2004 rape conviction. *Id.* ¶ 16. While in prison, Doe successfully completed DOCCS's Sex Offender Counseling and Treatment Program, along with DOCCS's Aggression Replacement Training. *Id.* ¶ 19. Before his release from prison, the New York State Supreme Court, Bronx County, classified Doe as a SORA ("Sex Offender Registration Act") Level Two sex offender. *Id.* ¶ 20. After that classification, Doe registered in the New York State Sex Offender Registry. *Id.*

On November 2, 2011, Doe was released from prison to a parole supervision term of four years and four months, which ended on March 2, 2016. *Id.* ¶¶ 25–26. Upon his release from prison, Doe was initially referred to the Bellevue Men's Shelter for housing because DOCCS determined that his proposed residence with his wife would not comply with the New York State Sexual Assault Reform Act ("SARA") as it was within 1000 feet of a school. *Id.* ¶ 30. In December 2011, however, Doe and Jane Doe proposed to reside in a different location in the Bronx. DOCCS approved this residence, and Doe moved into that residence with Jane Doe. *Id.* ¶ 31.

On November 3, 2011, the day after his release from prison, Doe reported to his assigned parole officer, Joseph Rehal. His release on parole was subject to numerous conditions; Rehal read these conditions to Doe. Doe stated that he understood them. *Id.* ¶¶ 29–30.

Relevant here, special condition 13 stated that Doe "will have no contact with any person under the age of eighteen, without the written permission of the supervising parole officer." *Id.* ¶ 29 & Ex. A.

To obtain permission to have contact with his youngest daughter, L.S., who was 12 years old at the time of his release, Doe, on December 6, 2011, filed a petition in Bronx Family Court requesting visitation with L.S.  *Id.* ¶ 32.  On February 1, 2012, the Bronx Family Court granted Doe's petition for visitation with L.S. upon the consent of L.S.'s mother, Doe's ex-wife, Martin. *Id.*

On April 3, 2012, Doe sought permission from his parole officer, Rehal, for his wife's cousin and young child to stay at their residence for two nights.  *Id.* ¶ 32.  Rehal denied this request.  He told Doe that children were not allowed in the apartment without the prior permission from Doe's parole officer.  *Id.*

Around May 2012, after the Bronx Family Court permitted Doe's visitation with L.S., Rehal, after consulting with senior parole officer Miguel Medina, permitted Doe to have contact with L.S. subject to the terms of the Family Court's order.  *Id.* ¶ 34.  Rehal was not aware of any adverse incidents or harm to L.S. during his tenure as Doe's supervising parole officer.  *Id.*  On August 22, 2012, the Bronx Family Court issued its final order as to Doe's access to L.S.; it granted Doe unsupervised visits with L.S.  *Id.* ¶ 35.

Doe's parole conditions also required him to participate in sex offender treatment.  *Id.* ¶ 36.  DOCCS sent Doe to the New York Center for Addiction Treatment Services ("NYCATS") to satisfy this condition.  Around November 18, 2011, Doe enrolled in programs at NYCATS. *Id.*  On September 29, 2012, Doe successfully completed the substance-abuse and sex-offender treatment programs at NYCATS.  *Id.* ¶ 37.

### 4.      The Birth of M.S.

Around February 2012, Jane Doe discovered that she was pregnant with John Doe's child.  *Id.* ¶ 38.  On or about April 19, 2012, John Doe alerted Rehal, his parole officer at the

time, that Jane Doe might be pregnant. Rehal counseled Doe about his sex offender restrictions. *Id.* In September 2012, John and Jane Doe's son, M.S., was born. *Id.* ¶ 3.

### 5. Doe's Ensuing Parole Supervision and the Roles of Each Defendant

Until March 2014, Doe was supervised by the Manhattan VI Area Office of the New York State Division of Parole, an office that specializes in the supervision of parolees convicted of sexual offenses and parolees with mental illnesses. In September 2012, DOCCS was preparing to transfer Doe's case from the Manhattan VI Area Office to the Bronx II Area office on account of Doe's residing in the Bronx. The Bronx II Area office ultimately supervised Doe from March 2014 until his parole ended in March 2016. *Id.* ¶¶ 27–28, 39–40.

On September 17, 2012, defendant Emily Scott, a parole officer at DOCCS in the Manhattan VI Area Office, was assigned to supervise Doe. She ultimately supervised Doe as his parole officer until September 19, 2013. *Id.* ¶ 8. The responsibilities of a parole officer include monitoring assigned parolees' compliance with the terms and conditions of their parole and with the standards of parole supervision. *Id.* ¶ 4.

At all relevant times:

Defendant James Cappiello was a senior parole officer at the Manhattan VI Area Office. Cappiello was assigned to oversee Doe's supervision from around September 2012 to April 2013. *Id.* ¶ 6.

Defendant Joseph Lima was a bureau chief of the Manhattan VI Area Office. He held this position for the duration of Doe's supervision by that office. *Id.* ¶ 4. Lima was generally responsible for the supervision of three senior parole officers and between 17 and 25 parole officers. *Id.*

Defendant Richard Rosado was a senior parole officer at the Manhattan VI Area Office. He was assigned to oversee Doe's supervision from around June 2013 until around March 2014, although he was also involved in decisions regarding Doe's supervision beginning in at least October 2012. *Id.* ¶ 5.

Defendant Simon Valerio was a parole officer at the Manhattan VI Area office. He was assigned to supervise Doe as a parole officer from about September 19, 2013 until about December 16, 2013. *Id.* ¶ 7.

### 6.     The Parole Department's Separation of Doe From M.S.

After being assigned to supervise Doe, on September 17, 2012, Scott reviewed Doe's parole file and his Parolee Chrono Report ("PCR"). *Id.* ¶ 39. On September 25, 2012, Scott and Cappiello met to review Doe's case. They discussed preparing the transfer of Doe's case to the Bronx Parole Office, because Doe was residing in the Bronx. *Id.* ¶ 40.

### a.     The First Separation of Doe From M.S.

On October 4, 2012, the month after M.S.'s birth, Doe went to the Manhattan VI Area Office for an office report. *Id.* ¶ 41. He met with Scott, Rosado, and Cappiello, and mentioned that he was residing with his wife and newborn child, M.S. In response, Scott, Rosado, and Cappiello told Doe that he was not allowed to reside or otherwise have contact with M.S. because of the special condition of his parole that prohibited contact with any person under age 18 without the written permission from his parole officer. *Id.*

Doe protested. He explained that the Bronx Family Court had approved his petition for unsupervised visitation with his daughter, L.S., then age 14. During the meeting, Scott, Rosado, and Cappiello did not ask Doe any questions about his relationship with M.S. or otherwise seek

any information from Doe. Doe became visibly upset during this meeting and Scott thought he might need medical assistance. *Id.*

During the October 4, 2012 meeting, Scott, at Cappiello's instruction, required Doe to sign a document containing additional conditions of parole. The statement that Doe was directed to sign, and did sign, affirmed that he must immediately leave Jane Doe's and M.S.'s residence and not have any contact with any children under age 18. It stated that "residing with wife and new born is clearly a violation of my release conditions. I must seek visitation order with regard to new born child [M.S.]. I am aware that I can not have contact with child until approval by Family Court and Parole Officer Scott." *Id.* ¶ 42 & Ex. B.

The three parole officials—Scott, Rosado, and Cappiello—based their decision to order Doe out of his residence with Jane Doe and M.S. on the special condition of parole that prohibited Doe from having contact with person under age 18 without the written permission of the parole officer supervising Doe. *Id.* ¶¶ 43, 48. These officials did not consider allowing Doe to have restricted contact with M.S. instead of simply no contact at all. Nor did the officials consider their decision subject to modification. *Id.* Doe had been aware of his special parole condition, although Doe had not had notice that the parole authorities would not permit him to have contact with M.S. *Id.* ¶¶ 44–45. Jane Doe was not contacted by any DOCCS officials before, during, or after the October 4, 2012 meeting, including for the purpose of asking her whether she supported or opposed parental contact between John Doe and M.S. *Id.* ¶ 46.

After the October 4, 2012 meeting with Scott, Rosado, and Cappiello, Doe complained orally to supervisor Lima about being prohibited from contact with M.S. *Id.* ¶ 47. This was the first time Lima had spoken with Doe. Lima previously had consulted with Doe's prior parole officer, Rehal, about Doe's parole supervision. *Id.* Later that day, Lima spoke to Cappiello,

Rosado, and Scott. Lima told them that their decision not to permit Doe to have contact with M.S. was correct because Doe's parole condition prohibited contact with any person under age 18 in the absence of written permission from the parole officer. *Id.*

Later in the day on October 4, 2012, after the meeting with Doe, Scott called Cornelia Krieger, assistant director at NYCATS. *Id.* ¶ 49. Krieger told Scott that Doe had been extremely compliant, that Doe had maintained a 100 percent attendance rate at NYCATS, and that NYCATS assessed Doe to be at a low risk of recidivism with no indicators of reoffending. *Id.* ¶ 49.

After the October 4, 2012 meeting with DOCCS officials, Doe immediately moved out of his residence and into a homeless shelter. Pl. 56.1 ¶ 41.

On October 5, 2012, Doe filed a petition in Bronx Family Court for visitation with M.S. *Id.* ¶ 50. Jane Doe consented to this petition. *Id.*

On October 6, 2012, Doe showed Scott the Final Order issued by the Bronx Family Court granting unsupervised visitation with L.S. *Id.* ¶ 51. Doe also told Scott that he had filed a petition in Bronx Family Court for visitation with M.S. Scott again directed Doe not to have any contact with M.S. Scott also directed Doe to provide all court-related information on his next report date with her, which was scheduled for October 11, 2012. *Id.*

On October 11, 2012, Doe provided Scott with the court information for his petition, and with a letter of recommendation from NYCATS. *Id.* ¶ 52.

On October 17, 2012, Scott visited Bronx Family Court to obtain more information on the Final Order relating to Doe's right to unsupervised visitation with L.S. *Id.* ¶ 53. Scott was unable to obtain additional information there due to a fire drill. Sometime after Doe filed his

petition for visitation with M.S., Scott told an investigator for Bronx Family Court that Doe could not have any contact with anyone under age 18. *Id.*

On March 12, 2013, Doe's petition for visitation with M.S. in Bronx Family Court was dismissed without prejudice because "the conditions of the Petitioner's probation indicate that he is not to live in the same home as a child under the age of 18." *Id.* ¶ 54.

Doe continued to reside in the homeless shelter. On December 12, 2012, at an office report, Scott reiterated to Doe that he was not permitted to have any contact with M.S. or any other children. *Id.* ¶ 55.

On January 24, 2013, Scott spoke to Mary Osborne, deputy director of DOCCS's Sex Offender Management Unit and discussed Doe's request to have parental contact with M.S. *Id.* ¶ 56. Osborne recommended that Doe be referred back to NYCATS for an updated interview and evaluation to assess Doe's suitability for reuniting with his family. *Id.* At some later point in January 2013, Scott informed Cappiello of her conversation with Osborne. *Id.* ¶ 57. Cappiello had not been previously aware that Scott was considering permitting Doe to return to the family residence and have contact with M.S. Cappiello himself had not been taking any steps to explore Doe's reuniting with his family. *Id.*

Doe then underwent an evaluation by NYCATS officials. On January 29, 2013, Steven Rego, a licensed master social worker from NYCATS, met with Doe to evaluate his suitability to return home to Jane Doe and M.S. *Id.* ¶ 58 & Ex. C. Rego interviewed Doe and noted that Doe denied that he committed the sexual offenses of which he had been convicted of in 2004 and for which he was on parole. Rego noted that the Parole Board records indicated that in his hearing before the Parole Board, Doe had "denied putting his penis in his niece but acknowledged that he began to touch his niece and then progressed to oral sex with her." *Id.* Rego noted that Doe

stated to him in the interview that he, Doe, "only said these to the parole board because he wanted to be released and was thus lying to the parole board." Rego noted that Doe maintained in his meeting with Rego that "he did not molest her in any way." *Id.*

On February 4, 2013, Rego, in a follow up meeting, met again with John Doe and Jane Doe. *Id.* ¶ 58 & Ex. C. Rego noted that Doe again denied that he committed the sexual offenses and that "he admitted some sexual contact to the parole board because he believed it was the only way he would be released." *Id.* Rego concluded after this meeting that "Doe should be permitted to reside with his wife. Cohabitation with a partner of the opposite sex is actually a protective factor for those who commit sexual offenses. It also puts [Doe] with someone who can offer support if needed. It is therefore conducive to the principles of relapse prevention." *Id.*

After this evaluation, on February 7, 2013, Scott told Doe that he could return home and have contact with M.S. *Id.* ¶ 59. That same day, John Doe moved back in with Jane Doe and M.S. at the family's apartment in the Bronx. *Id.* Scott recorded her grant of permission to Doe to return home in an entry in the PCR record she created that day. Other than that PCR entry, there is no written statement of permission from Scott to Doe to return home and have contact with M.S. in the record of this case. *Id.*; *see also* Pl. 56.1, Ex. 3 ("Doe PCR"). There is also no PCR entry reflecting any review or approval by a senior parole officer or bureau chief permitting Doe to have contact with M.S. JSF ¶ 60.

On April 8, 2013, Scott and Cappiello met to review Doe's case. They discussed that Doe was living in the Bronx with his family, but Cappiello did not recall appreciating during that meeting that Doe was then residing with M.S. *Id.*

**b.** **The Second Separation of Doe From M.S.**

In April 2013, Doe's was case was scheduled to be transferred to the Bronx Area II Office. *Id.* ¶ 61. On April 19, 2013, a parole officer in the Bronx Area II Office made an entry in Doe's PCR noting that Doe had recently been given permission to reside with his wife and M.S. *Id.* ¶ 61. Around April 22, 2013, the bureau chief of the Bronx Area II Office, Rodney Young, spoke with Lima about Doe's case. The transfer of supervision over Doe's parole from the Manhattan VI Area Office to the Bronx Area II Office was cancelled. *Id.*

On June 17, 2013, Rosado instructed Scott to review Doe's case to confirm that it was proper for Doe to reside with his family, after Rosado determined that there did not appear to be any record reflecting that an exception had been made for SARA compliance. *Id.* ¶ 62.

On July 1, 2013, Rosado directed Scott to discuss, with Lima, Doe's living arrangement with Jane Doe and M.S. *Id.* ¶ 63. On July 11, 2013, in anticipation of Rosado's review of whether Doe could reside with M.S., Scott told Doe to compile all Family Court documents, along with NYCATS reassessment. *Id.* ¶ 64.

On August 6, 2013, Rosado instructed Scott to require Doe to move out of his residence with Jane Doe and M.S. as soon as possible. *Id.* ¶ 65. That same day, Rosado discussed Doe's living arrangement with Lima. Lima also determined that Doe should not be permitted to live with M.S. and must move out of the residence with Jane Doe and M.S. *Id.* Lima's determination was based on Doe's conviction for sexual offenses and because of the Parole Board's condition prohibiting any contact with a person under age 18 in the absence of written permission from the parole officer. *Id.*

On August 22, 2013, Scott told Doe that he was not permitted to have any contact with M.S. and would have to move back to a homeless shelter. *Id.* ¶ 66. Scott was not directed to advise Doe, and did not advise Doe, of any procedure under which Doe could challenge this

decision.  *Id.*  Before August 22, 2013, Doe had not been contacted by Scott, Rosado, or Lima as to this issue, and had not been notified that he would be prohibited from having contact with M.S. and ordered to move out of the family's residence.  *Id.* ¶ 67.

On September 5, 2013, a different parole officer told Doe to move out of the family residence immediately.  Doe moved out of the residence and returned to a homeless shelter in the Bowery in Manhattan.  *Id.* ¶ 68.

Around September 19, 2013, Rosado removed Doe from Scott's supervision.  Rosado appointed Valerio as the parole officer supervising Doe.  *Id.* ¶ 69.  Rosado removed Scott as Doe's parole officer because Scott had permitted Doe to live with his family and have contact with M.S.  Rosado instructed Scott not to have further contact with Doe or involvement with his case.  *Id.*  Scott conferred with Valerio about the transfer of Doe's case from her to him.  *Id.*

### c.     Doe's Invocation of DOCCS's Parental Contact Protocol

On August 21, 2013, shortly before the second period in which Doe was separated from M.S., DOCCS adopted a new directive, Agency Directive 9601, entitled the "Parental Contact Protocol."  *Id.* ¶ 70 & Ex. D ("Parental Contact Protocol" or "Protocol").  The Parental Contact Protocol addresses the "parental legal rights that must be considered in instances where: (1) an individual who is expected to be under or is under community supervision (a releasee); and (2) the releasee is the biological or adoptive parent of a minor (a person under the age of 18); and (3) a condition of the releasee's supervision limiting or prohibiting such contact has been imposed by DOCCS."  *Id.* ¶ 71.  The Protocol sets out DOCCS's administrative procedure to determine the conditions that "are reasonably necessary for a releasee to properly exercise his/her parental rights while protecting his/her children from harm or danger."  *Id.*

On September 17, 2013, an attorney for Doe sent a letter to the New York State Board of Parole, and two senior officials: Anthony J. Annucci, the acting commissioner of DOCCS, and Terrance X. Tracy of the New York State Board of Parole. The letter asked that DOCCS immediately permit Doe to return to his family's home to reside with Jane Doe and M.S. *Id.* ¶ 72 & Ex. E. On September 26, 2013, Doe's attorney sent the same letter to Lima. *Id.*

On October 2, 2013, Lima told Doe's attorney that Lima would initiate an investigation pursuant to the Parental Contact Protocol to determine whether to permit Doe to reside with M.S. *Id.* ¶ 73. Lima noted that the Protocol gave DOCCS 45 days to complete its investigation but told Doe's attorney that Lima expected the investigation into Doe's case to be "expedited." *Id.* ¶ 73.

On October 7, 2013, Lima, Rosado, and Scott met to discuss the investigation into Doe's request for parental contact with M.S. *Id.* ¶ 74. Lima and Rosado directed Scott to review the Parental Contact Protocol and to assist Doe in gathering documentation germane to DOCCS's investigation. *Id.* Scott then spoke to John Doe and Jane Doe in separate phone calls. *Id.*

On October 8, 2013, Doe reported for a regular office visit and provided paperwork required by the Protocol. *Id.* ¶ 75. The same day, Scott spoke to Martin, Doe's ex-wife, who agreed to provide additional documentation in support of Doe's request for parental contact with M.S. *Id.* ¶ 76. On October 10, 2017, Doe had his first visit with Valerio; they discussed Doe's parole conditions and Doe's request for parental contact with M.S. *Id.* ¶ 77. On October 11, 2013, Doe submitted to Scott a letter from Martin that supported Doe's request for such contact, along with other paperwork relating to Scott's request under the Protocol. *Id.* ¶ 78.

Valerio was the lead investigator in the investigation under the Protocol. *Id.* ¶ 81. As Rosado directed, parole officers Rennie Rodriguez and Rebecca Rodriguez assisted Valerio. *Id.*

Rosado directly oversaw the investigation; Lima and Rosado determined which documents should be reviewed and who should be interviewed. *Id.* Valerio, Rennie Rodriguez, and Rebecca Rodriguez took the following actions as part of their investigation. *See id.* ¶ 82:

(1)     On October 22, 2013, Valerio, in an attempt to gather information about Doe's criminal conviction, contacted the Bronx District Attorney's Office. He learned that the Assistant District Attorney who prosecuted Doe's criminal case no longer worked in that office, but was told that a supervisor at that office would order the records from the criminal case. *Id.* ¶ 82.a.

(2)     On October 24, 2013, Valerio, with Rennie Rodriguez, visited the Bronx Administration for Children Services office. They searched for records related to Doe or the complaining witness in Doe's criminal case but were unsuccessful in finding any. *Id.* ¶ 82.b.

(3)     On October 25 and 26, 2013, Valerio and Rennie Rodriguez went to Martin's residence and interviewed her about Doe's criminal case and his request to have contact with M.S. Martin told Valerio and Rodriguez that she had known Doe for 20 years and had no objection to his request for parental contact. She stated she felt comfortable leaving her children with him. She also provided Valerio and Rodriguez with a written statement supporting Doe's request for parental contact. During the October 26, 2013 visit with Martin, Valerio and Rodriguez also interviewed L.S., who said that she never had a problem with her father, Doe, and that she has a nice relationship with him. *Id.* ¶ 82.c.

(4)     On November 4, 2013, Rebecca Rodriguez called the complaining witness in Doe's criminal case and spoke with her about Doe's request for parental contact. In

their conversation, Rodriguez informed the complainant that the purpose of the interview was to get her perspective on Doe's request for parental contact. The complaining witness stated that she did not see a reason for her to be interviewed because she had nothing positive to say about Doe. The complaining witness also stated, in response to Rodriguez's question whether Doe should be permitted to reside with M.S., "Why should he live happy and comfortable when he took something from [me] that [I] can't get back[?]" Rodriguez asked if the complaining witness would be willing to undertake a face-to-face interview with Rodriguez; the complaining witness refused that request. The complaining witness indicated, however, that she would be willing to speak further by phone. The next day, November 5, 2013, Rebecca Rodriguez called the complaining witness several times and left several voicemails, but Rodriguez never heard back from the complaining witness. *Id.* ¶ 82.d.

(5)     Also on November 4, 2013, Valerio and Rennie Rodriguez interviewed Jane Doe at her residence. Jane Doe told them that she "feels completely safe with [Doe] residing with their son." She also provided a written statement indicating her strong desire to live together with Doe and their son. *Id.* ¶ 82.e.

(6)     On November 8, 2013, Valerio and Rennie Rodriguez visited Bronx Family Court and attempted to review the files of Doe's petitions for visitation with L.S. and M.S. They were ultimately not able to review these records. *Id.* ¶ 82.f.

(7)     On November 9, 2013, Valerio and Rennie Rodriguez visited the New York Police Department's Special Victims Bureau in the Bronx. There they received information relating to Doe's 2005 criminal case. *Id.* ¶ 82.g.

(8)     On November 19, 2013, Valerio and Rebecca Rodriguez visited the Bronx District Attorney's Office, where they reviewed documents relating to Doe's 2005 criminal case.  *Id.* ¶ 82.h.

(9)     On December 6, 2013, Valerio and Rebecca Rodriguez visited Bronx Family Court and, having received permission from Doe, reviewed the files for Doe's petitions for visitation with L.S. and M.S.  *Id.* ¶ 82.i.

On November 18, 2013, Doe's attorney provided Lima with a clinical evaluation of Doe conducted by a psychiatrist, *see* JSF Ex. G, which Lima forward to Rosado and Valerio.  *Id.* ¶ 83.  The psychiatrist recommended that Doe be permitted to return to his family, concluding: "[I]t is my opinion to a reasonable degree of medical certainty that his risk of abusing his son is virtually nil and that he should be allowed to live with his family.  Indeed, if one were to do an analysis based on the best interest of the child and weigh the benefits of [Doe's] return home and cohabitation with his family versus the risks to his son of doing so, the result would very much support his return to his family."  JSF, Ex. G at 16359.

On December 3, 2013, Doe's attorney sent a letter to Lima that noted that 63 days had passed since October 2, 2013, when Lima had told Doe's attorney that DOCCS would be undertaking an "expedited" investigation under the Parental Contact Protocol.  *Id.* ¶ 84 & Ex. H. The letter requested that DOCCS either immediately conclude its investigation or inform Doe's attorney of the reasons for the delay.  *Id.*  Lima did not provide any explanation of the delay to Doe or Doe's attorney.  *Id.*

On December 19, 2013, Rosado submitted to Lima a report summarizing the results of the investigation.  *Id.* ¶ 85 & Ex. I.  Rosado's report was based on the documents collected and prepared by Valerio, Rennie Rodriguez, and Rebecca Rodriguez, along with the material

provided by Doe's attorney.  *Id.* ¶ 86.  Rosado submitted those documents to Lima; they constituted the entirety of what Rosado reviewed in connection with his investigation.  *Id.*; *see also* JSF, Ex. J.  The report did not make a recommendation of whether Doe should be permitted to reside with M.S.  JSF, Ex. I.  Before this report, Valerio had been transferred to another parole office.  He gave no input or recommendations regarding Rosado's December 19, 2013 report to Lima.  JSF ¶ 85.

Two months later, on February 21, 2014, Lima issued a determination denying Doe any contact with M.S.  *Id.* ¶ 87 & Ex. K.  Lima did not consider or permit Doe to have limited contact with M.S., having determined that he did not need to consider whether to permit limited contact because Lima had understood Doe to have requested to reside with M.S. and not to have requested limited or supervised contact with M.S.  *Id.*  In his determination, Lima acknowledged that Doe "presently denies guilt and has elicited quite a bit of community support."  JSF, Ex. K.  But, Lima concluded, "[I]t would not be in the best interest of the child to be put at risk if [Doe's request] was to be approved."  Lima stated that, in committing his crimes, "the subject was extremely manipulative and engaged in behaviors that involved extensive grooming, intimidation and coercion of the 13 year old victim," and that the crimes "occurred within the family constellation and in some instances while other family members were present in the residence." *Id.*  Lima noted that "[c]onsidering the degree of manipulation needed to engage in this crime without detection, the subject's denials are a significant concern.  While the attorneys have submitted several sex offender treatment provider[s] who support the subject, it should be noted that none of these providers contacted the victim as was done by the Parole Officer in this case. The victim's perspective is always important and in this case along with police reports reveal an

extensive web of deception as part of this crime. Based on the subject's denials there is no reason to believe that the subject has shown true progress in treatment." *Id.*

Although the Parental Contact Protocol calls for investigations pursuant to it to be completed within 45 days, the investigation into Doe's request for contact with M.S. lasted longer, *id.* ¶ 88, at least 137 days, beginning on October 7, 2013 at the latest and ending with Lima's February 21, 2014 determination denying Doe any contact with M.S.

### 5. Appeal of Lima's Determination and Aftermath of the Investigation

On April 3, 2014, Doe notified William Hogan, the regional director of DOCCS responsible for overseeing the Manhattan VI Area Office, of his intention to appeal Lima's determination denying Doe contact with M.S. *Id.* ¶ 89. Pursuant to the Parental Contact Protocol, Hogan then scheduled a "Parental Case Conference" in Doe's case for May 5, 2014. *Id.*

Prior to the conference, on April 25, 2014, Doe filed this lawsuit. *Id.* ¶ 90; *see also* Dkt. 1. John Doe and Jane Doe also sought emergency relief from this Court, Dkts. 6–9. That application was the subject of a series of emergency hearings before this Court. The Court encouraged Hogan to rule promptly on Doe's appeal, so as to permit the Court—if Hogan's ruling did not moot Doe's bid for emergency relief—to take Hogan's assessment into account. *See* Dkt. 48.

Doe, Jane Doe, and their attorneys attended the May 5, 2014 conference with Hogan, as did Lima, who attended at Hogan's request and over Doe's and Jane Doe's objection. *Id.* ¶ 91.

On May 22, 2014, Hogan issued a decision reversing Lima's determination and permitting Doe to have contact with M.S. *Id.* ¶ 92 & Ex. L. Hogan's order stated that the Parole Board's special condition prohibiting Doe from having contact with anyone under age 18

without the permission of the parole officer is "modified to allow [Doe] contact with his biological son, [M.S.]. This may result in possible reunification with his son in the marital household." JSF, Ex. L. Hogan noted, however, that Doe "is still subject to the original condition of his release," and that his decision "does not preclude any future decision to bar [Doe] contact with his son based on emerging issues, conditions or circumstances which would indicate to a parole officer that he is likely to or has sexually reoffended any child." *Id.*

In making that determination, Hogan reviewed the same information available to Lima when Lima had barred contact between Doe and M.S. including Rosado's report and the documents prepared during the investigation. *Id.* ¶ 92. Hogan did not review any material that had not been reviewed by Rosado or Lima, save an additional letter Doe's attorneys submitted. *Id.* In making that determination, Hogan did not seek the advance approval of the Parole Board or of a court or seek any modification or amendment of Doe's conditions of parole supervision. *Id.*

Around June 4, 2014, Doe received modified parole conditions from his parole officer in the Bronx Area II Office. These permitted him to have unrestricted contact with M.S. and with L.S. *Id.* ¶ 93. Doe thereafter returned to reside with Jane Doe and M.S.

During the duration of Doe's supervision by the Manhattan VI Area Office, Doe was compliant with all conditions of parole. The parole officers who supervised him were not aware of any instances in which he harmed L.S. or M.S., including during the period in which he was permitted to have parental contact with either of them. *Id.* ¶ 94.

## B. Procedural Background

On April 25, 2014, plaintiffs filed their initial complaint, pseudonymously and under seal. *See* Dkts. 1–5. On May 2, 2014, plaintiffs moved for a temporary restraining order and a

preliminary injunction. Dkts. 6–9. They withdrew that motion after DOCCS, on May 22, 2014, permitted contact between Doe and M.S., *see* Dkt. 45, and revised Doe's parole conditions to permit unrestricted contact with M.S., *see* Dkts. 52, 54–58. On June 26 and August 15, 2014, Rosado and Scott filed answers. Dkts. 68, 94. On July 2 and July 30, 2014, the remaining defendants filed motions to dismiss. Dkts. 73, 82, 86.

On September 4, 2014, with leave, plaintiffs filed a First Amended Complaint ("FAC"), the operative complaint today. Dkt. 100. The FAC brings three claims, all under 42 U.S.C. § 1983, asserting violations of plaintiffs' constitutional rights to substantive due process, FAC ¶¶ 90–97, freedom of association, *id.* ¶¶ 98–104, and procedural due process, *id.* ¶¶ 105–12. The FAC named as defendants Anthony Annucci, DOCCS's acting commissioner; Lima; Cappiello; Valerio; Scott; and Rosado, along with Rennie Rodriguez and Rebecca Rodriguez. *Id.* ¶¶ 13–21. On September 8, 2014, plaintiffs voluntarily dismissed their claims against several defendants named in the original complaint. *See* Dkt. 104.

Between September and December 2014, Scott filed an answer, Dkt. 127, and the other defendants filed motions to dismiss, which plaintiffs opposed, *see* Dkts. 112, 114, 116, 119–21, 124–25, 130–31, 133, 141–43, 145.

On July 15, 2015, the Court issued an opinion and order granting the motions as to Rennie Rodriguez and Rebecca Rodriguez but otherwise denying all motions to dismiss. Dkt. 146 (*Doe v. Annucci*, No. 14 Civ. 2953 (PAE), 2015 WL 4393012 (S.D.N.Y. July 15, 2015)).

On August 6, 2015, Annucci, who had been sued in his official capacity and against whom only injunctive relief was sought, filed an interlocutory appeal of the Court's denial of his motion to dismiss, on the ground that the case against him was barred by sovereign immunity. Dkt. 169. On May 10, 2016, after Doe's term of parole had ended on March 2, 2016, plaintiffs

and Annucci filed a motion to voluntarily dismiss Annucci as a defendant with prejudice, Dkt. 198,[2] which, on May 17, 2016, the Court granted, Dkt. 200.

Fact discovery ended on July 1, 2016. Dkt. 205. On August 18, 2016, the Court held a pre-motion conference and set a schedule for summary judgment briefing. *See* Dkt. 218. On October 18, 2016, the parties filed the JSF and attached exhibits. Dkt. 229. On November 10, 2016, plaintiffs filed their motion for summary judgment as to liability against all defendants, Dkt. 233, and included a Rule 56.1 Statement, Dkt. 234, a memorandum of law, Dkt. 235, and a declaration of Blair R. Albom in support, Dkt. 236, which attached exhibits. On December 23, 2016, Lima and Valerio filed a motion for summary judgment, Dkt. 264, and, in support, declarations of Lima, Dkt. 265, and Valerio, Dkt. 266, an affirmation of Jeffrey P. Mans, Dkt. 267, a Rule 56.1 Statement, Dkt. 268, a response to plaintiffs' Rule 56.1 Statement, Dkt. 269, and a memorandum of law, Dkt. 270.[3] On December 23, 2016, Rosado filed a declaration in support of his motion for summary judgment, Dkt. 245, which included a response to plaintiffs' Rule 56.1 Statement and included Rosado's Rule 56.1 Statement, and filed a memorandum of law, Dkt. 246. On December 26, 2016, Cappiello filed a memorandum of law in opposition to plaintiffs' motion, Dkt. 253, and a declaration of Robert A. Soloway in opposition, Dkt. 258. On January 26, 2017, plaintiffs filed a reply in support of their motion and an opposition to defendants' motions, Dkt. 272, as well as responses to Lima's and Valerio's Rule 56.1 Statement and Rosado's Rule 56.1 Statement, Dkts. 273–74, and an additional declaration of Blair R.

---

[2] Plaintiffs and Annucci had filed a stipulation of dismissal of Annucci's appeal in the United States Court of Appeals for the Second Circuit.

[3] Due to ECF deficiencies identified by the Clerk of Court, these filings were re-filed several weeks after their initial filing. The Court treats them as timely and cites here to the later, ECF-compliant filings.

Albom in support of plaintiffs' motion for summary judgment, Dkt. 275. On February 15, 2017,

Rosado, and Lima and Valerio, filed reply memoranda of law in support of their motions. Dkts.

279–80.

## II.    Applicable Legal Standards for a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a

question of material fact. In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d

Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co*., 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation

marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by

"citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also*

*Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing

law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

248 (1986). In determining whether there are genuine issues of material fact, the Court is

"required to resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d

Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

## III.    Discussion

Plaintiffs bring damages claims under § 1983 for violations of three constitutional rights: to (1) familial association under the First Amendment, and to (2) substantive and (3) procedural due process under the Fourteenth Amendment.  Plaintiffs argue that each defendant—all parole officials at DOCCS—caused deprivations of these rights.[4]  With discovery complete, and with the facts largely undisputed, plaintiffs argue that the undisputed facts establish each defendant's liability, supporting entry of summary judgment as to liability.  Three defendants, Lima, Valerio, and Rosado, in turn pursue summary judgment in their favor as to liability.  While denying that plaintiffs' rights were infringed, they primarily argue that the evidence does not establish that they were personally involved in such infringements and/or that they are entitled to qualified immunity.  A fourth defendant, Cappiello, opposes plaintiffs' summary judgment motion on the same grounds as the other defendants, but does not move for summary judgment.  The fifth defendant, Scott, neither moved for summary judgment nor filed a brief opposing plaintiffs' motion.

The Court first reviews the constitutional rights on which plaintiffs' claims are based and assesses whether plaintiffs were deprived of these rights.  For the reasons explained below, the Court finds—based on the undisputed facts—that plaintiffs' rights were infringed during parts of both periods in which Doe was categorically barred from contact with his infant son.  The Court

---

[4] Plaintiffs have not sued DOCCS for damages, presumably because such a suit would be barred by principles of sovereign immunity.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding states and state governments are not "persons" within meaning of § 1983 and are therefore protected by sovereign immunity from suits brought under § 1983).

then considers defendants' claim of qualified immunity and, for each, whether that defendant was or was not personally involved in these violations so as to be liable, or whether material disputes of fact prevent entry of summary judgment as to liability.

### A.    Were Plaintiffs Deprived of Constitutional Rights?

Although plaintiffs claim deprivations of three constitutional rights, the analysis as to two—to intimate association and to substantive due process—is coextensive.  As the Second Circuit has explained, "[t]he source of the intimate association right has not been authoritatively determined," in that the Supreme Court has considered claims as to this right in connection with both the First Amendment and the Fourteenth Amendment's Due Process Clause.  *See Adler v. Pataki*, 185 F.3d 35, 42–43 (2d Cir. 1999); *see also Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 57 n.17 (2d Cir. 2014) (recognizing lack of clarity as to source of the right).  The Second Circuit has analyzed this right using the framework of substantive due process because the Supreme Court has described the right as a "fundamental element of personal liberty."  *See Patel v. Searles*, 305 F.3d 130, 135–38 (2d Cir. 2002) (quotation omitted); *see also Garten v. Hochman*, No. 08 Civ. 9425 (PGG), 2010 WL 2465479, at *4 (S.D.N.Y. June 16, 2010) ("Where the intimate association right at issue is tied to familial relationships and is independent of First Amendment retaliation concerns . . . the Second Circuit has employed an analysis under the framework of the Fourteenth Amendment right to substantive due process.").  This Court follows this approach and refers to these two claims together as plaintiffs' substantive due process claim.

It is well established that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by substantive due process.  *United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005); *see also, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion) ("[T]he interest of parents in the care, custody, and control of their

children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents[.]"). This right applies reciprocally to both parents and their children. *E.g.*, *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012).

Restrictions on such protected liberty interests are subject to strict scrutiny. "[T]he Fourteenth Amendment 'forbids the government to infringe fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *E.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (alteration omitted) (emphasis in original) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). The doctrine of substantive due process thereby guards against the "exercise of power without any reasonable justification in the service of a reasonable governmental objective," *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 846 (1998). At the same time, to assure that the Constitution does not become "a font of tort law," an infringement must be sufficiently serious and arbitrary that "it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8. To violate substantive due process in connection with an infringement of the liberty interest in familial association, the compulsory separation of parent from child must have been "prohibited by the Constitution" independent of compliance with procedural due process. *Southerland*, 680 F.3d at 152 (quotation and alteration omitted).

The Second Circuit has applied strict scrutiny to restrictions on liberty incident to post-prison supervisory regimes, whether denominated as parole (as in New York State) or as supervised release (as in the federal system). Most apposite, in *Myers*, the Second Circuit considered a special condition of supervised release prohibiting the defendant "from spending

time alone with his child absent authorization from the U.S. Probation Office." 426 F.3d at 120. This provision was imposed pursuant to 18 U.S.C. § 3583(d), which required that conditions of supervised release "involve[] no greater deprivation of liberty than is reasonably necessary" to achieve the statute's purposes. The Second Circuit, per then-Judge Sotomayor, held that, to satisfy substantive due process, such a restriction on a releasee's liberty "must reflect the heightened constitutional concerns" of strict scrutiny, meaning that the deprivation must be "narrowly tailored to serve a compelling government interest." *Myers*, 426 F.3d at 126.

Two Second Circuit cases, each involving conditions separating a releasee parent and child, frame the Court's assessment of plaintiffs' claim of an unconstitutional deprivation of substantive due process.

In *Myers*, as noted, the Second Circuit held that a supervised release term prohibiting a defendant from spending time alone with his child was subject to strict scrutiny. However, the Circuit held that it could not determine, on the record before it, whether that condition satisfied strict scrutiny for two reasons. First, it was unclear what the compelling government interest was in that condition. Second, it was unclear whether the defendant, who was "the parent of a child in foster care born out of wedlock," in fact had a fundamental liberty interest. *Myers*, 426 F.3d at 127–30. The Second Circuit remanded to the district court to balance "the intended purpose of the challenged condition" against the defendant's interest, if any. *Id.*

In *United States v. McGeoch*, 546 F. App'x 44 (2d Cir. 2013) (summary order), the Second Circuit applied strict scrutiny to a parole condition that—like the one here—barred the defendant from any contact with a person under age 18 unless supervised by a person approved by the parole officer. The condition restricted the defendant's contact with his sons. *Id.* at 48 ("A condition of supervised release that prevents a father from seeing his children outside the

presence of an approved monitor is a severe one subject to careful scrutiny.").  The Circuit held that, to determine whether such a condition satisfied due process, an individualized evaluation of the threat the defendant actually posed to the safety of his children was necessary:  "Absent an individualized inquiry into whether [the defendant's] sexual proclivities pose a threat to his sons . . . the imposition of a harsh condition of supervised release that either prohibits interaction with his children or makes such interaction subject to supervision by a person approved of by the probation officer violates [the defendant's] due process rights."  *Id.* at 49 (citing *United States v. Wolf Child*, 699 F.3d 1082, 1092–93 (9th Cir. 2012)).  Taking "no position on whether this harsh application of [the parole condition] is warranted under the circumstances," the Circuit remanded to the district court to make this assessment, while directing that the district court must provide the defendant "with an opportunity to be heard" and "make specific findings to justify such a condition."  *Id.*

*Myers* and *McGeoch* guide the analysis of plaintiffs' claims of an infringement of the right to substantive due process.  Together, they instruct that parole conditions that bar a parent from all contact with a child or condition such contact on a parole officer's approval implicate a fundamental liberty interest in a familial relationship, are subject to strict scrutiny, require individualized justification based on the threat posed by the defendant to the child, and require that the releasee be given an opportunity to be heard before their imposition.

Here, to be sure, plaintiffs do not challenge Doe's special parole condition on its face.  But they contend that the parole authorities—for portions of each period in which Doe was quarantined from M.S.—egregiously misread that condition to treat it as mandating a categorical ban on contact between Doe and his son.  This, plaintiffs argue, was inconsistent with principles of substantive due process, which required any such ban be justified with reference, and

narrowly tailored, to Doe's individual circumstances. And, plaintiffs note, the special parole condition—which, like that in *McGeoch,* expressly authorized parole authorities to give written permission for such contact—anticipated that parole authorities would undertake such an individualized inquiry. To the extent the parole authorities deprived Doe of contact with M.S. during the two periods without undertaking an inquiry into whether it was safe for Doe to have contact with his child and/or without justifying this ban based on the results of the inquiry that was eventually undertaken, plaintiffs argue, they violated plaintiffs' substantive due process rights. Separately, plaintiffs argue that because the parole authorities denied Doe, for portions of each period, the opportunity to be heard as to why a ban on contact with M.S. was unjustified, these authorities also deprived plaintiffs of their procedural due process rights.

Based on its review of the summary judgment record—and the facts are almost entirely undisputed—the Court holds that plaintiffs' substantive and procedural due process rights were infringed.

As to plaintiffs' substantive due process claim: The parole authorities deprived Doe of all contact with his infant son for a combined nearly 13 months, spanning two periods. *See* JSF ¶¶ 41–47, 59, 65–68, 92–93. During these periods, Doe was forced from his home, where he lived with his wife, and relocated, for much of the two periods, to a homeless shelter. It is undisputed that Doe, Jane Doe, and M.S. had a fundamental liberty interest in their familial relationship. In order to be lawful, the parole officials' bar on their cohabitation and Doe's contact with M.S. was required to be narrowly tailored to serve a compelling government interest.

For significant parts of each period, however, the parole authorities' order barring Doe from contact with M.S. was neither factually justified nor narrowly tailored at all. These

deprivations of plaintiffs' fundamental liberty interests were sufficiently arbitrary and egregious to violate substantive due process.

The first period, between October 4, 2012 and February 7, 2013, lasted four months. The first day of that period, the parole officials—Scott, Rosado, and Cappiello, and later that day, Lima—justified barring Doe from contact with M.S. based on the special parole condition. That decision was initially justified: The special parole condition barred Doe from contact with any minor without "the written permission of the supervising parole officer." And the parole officials were permitted to deprive Doe of access to M.S. for a reasonable period while they investigated whether any restriction on contact with M.S. was justified to advance the state's interest in protecting M.S., and if so, to narrowly tailor that restriction to that interest. *See, e.g.*, *Southerland*, 680 F.3d at 153–54 (collecting cases holding, in context of removal of children from parental home in interest of safety, that parents' substantive due process rights are not violated provided that a post-removal proceeding is promptly held to evaluate the basis for the removal; court upholds four-day separation period).[5]

Thereafter, however, despite Doe's complaints—first to Scott, Rosado, and Cappiello, and then to their supervisor, Lima—no meaningful factual investigation ensued for three and one half months. The parole officials did negligible investigation. The two substantive data points the parole officials obtained *disfavored* a ban on contact with M.S., let alone a categorical ban: Later on October 4, 2012, NYCATS's assistant director, Cornelia Krieger, told Scott that Doe

---

[5] To be sure, some six months before M.S.'s birth, Doe had alerted his earlier parole officer, Rehal, to Jane Doe's pregnancy, JSF ¶ 38, such that the parole officials potentially could have inquired into the need for a ban on contact between Doe and his newborn before M.S. was born. For purposes of this decision, however, the Court treats the parole officers as having been put on notice of the need to apply the special parole condition on October 4, 2012, when Doe met with Scott, Rosado, and Cappiello for an office report.

had been extremely compliant and had maintained a 100 percent attendance record at NYCATS, and that NYCACTS assessed Doe to be at a low risk of recidivism with no indicators of reoffending. JSF ¶ 49. And, on October 6, 2012, Doe provided Scott with a final order of the Bronx Family Court granting him unsupervised visitation with L.S., Doe's daughter, then age 13. *Id.* ¶ 51. The parole officials, however, did not consider whether this information called the no-contact ban into question; they did not consider their decision to ban all contact with M.S. to be subject to modification; and, strikingly, they did not consider whether the lesser alternative of restricted contact between Doe and M.S. could be justified. *Id.* ¶¶ 43–45.

Between October 4, 2012 and January 24, 2013, the only actions taken to acquire information relative to Doe were Scott's unsuccessful attempt, on October 17, 2012, to obtain Family Court records regarding Doe's right to unsupervised visitation with L.S., *id.* ¶ 53, and Scott's monitoring of the petition Doe filed in Family Court on October 5, 2012, seeking permission to have contact with M.S., *id.* ¶¶ 51–54. That petition was dismissed, on March 12, 2013, in deference to the parole authorities: Scott had told a Bronx Family Court investigator that Doe could not have contact with anyone under age 18, *see id.* ¶ 52, and the Family Court, in dismissing Scott's petition, noted that "the conditions of the Petitioner's probation indicated that he is not to live in the same home as a child under the age of 18," *id.* ¶ 54.

Not until January 24, 2013, was any serious inquiry into the need for a no-contact ban undertaken. That day, Scott took up Doe's complaints with Mary Osborne, the deputy director of DOCCS's Sex Offender Management Unit, who recommended an updated NYCATS evaluation. Thereafter, events moved more quickly: The NYCATS evaluation resulted in a recommendation, on February 4, 2013, that Doe be permitted to reside with Jane Doe and M.S.,

and on February 7, 2013, Scott gave Doe permission to return home and to have contact with M.S. *Id.* ¶¶ 56–59.

This chronology unavoidably reveals an abject failure by parole authorities, during much of the first four-month no-contact period, to engage at all with the issues presented by Doe's request to reside with his wife and newborn son. No concerted attention was given to whether restrictions on contact with M.S., let alone a wholesale ban, were justified. The parole officials instead read special parole condition 13 to mandate a complete ban, ignoring the portion of that condition that expressly empowered them to permit such contact. The parole officials appear to have tacitly treated special parole condition 13 as imposing a ban that could be overcome only in the event of a court order authorizing visitation, and to have put the onus on Doe to take legal action in Family Court to obtain such relief. But special condition 13 did not impose any such regime. On the contrary: It expressly vested the parole officials with responsibility to determine whether to permit contact, or restricted contact, between Doe and M.S.

As a result of this abdication, the parole officials gave no considerations to the factors known to them that tended to disfavor the "harsh condition," *McGeoch*, 546 F. App'x at 49, of a total parent-child quarantine. These included that (1) unlike the victim of Doe's rape conviction, who was an adolescent girl, M.S. was a newborn boy and Doe's biological son; (2) since his rape conviction, Doe had been given permission, by the Bronx Family Court, to have unsupervised access to his adolescent daughter, L.S.; (3) Doe had successfully completed sex-offender treatment at NYCATS; and (4) NYCATS, two days after the parole officials applied the special condition to bar all contact with M.S., opined to Scott that Doe had a low risk of recidivism with no indicators of reoffending. *See Myers*, 426 F.3d at 127–28 (holding that, when defendant's prior offenses "involved girls" and "the PSR [had] stated that the focus of [the defendant's]

32

pedophilia was an attraction to females," for contact limitation to be imposed on defendant's contact with his "own son," district court was obliged "to develop a record demonstrating the danger to that child . . . how the condition will deter misconduct toward that child"; government had "offered no evidence to show that [] child, a male, was in any danger from his father"). Under these circumstances, the parole officials failed to justify the infringement on Doe's (and his wife and son's) familial association rights. And they failed to tailor the restriction they imposed to the facts particular to Doe. On this factual record, even if an initial period of separation pending investigation of individualized circumstances would have been permissible, the four-month ban on parent-child contact imposed here cannot be squared with strict scrutiny.

The second period in which all contact between Doe and M.S. was forbidden, between September 5, 2013 and May 22, 2014, lasted eight and one-half months. A substantial portion of that ban, too, cannot be justified consistent with Doe's substantive due process rights and the requirements of strict scrutiny. The ban was not resurrected by Lima and Rosado based on new information. Instead, they overruled Scott's decision to permit Doe's return to his home based on Doe's earlier rape conviction and on the fact that the special parole condition banned contact with persons under age 18 without the parole officer's permission. JSF ¶ 65. The record does not reflect that these officials considered the different factual context of Doe's rape conviction and his bid to live with his newborn son; that Doe had been permitted unsupervised contact with his adolescent daughter and that these visits had been without incident; that Doe had completed sex-offender treatment; or that NYCATS had found Doe to be at a low risk of recidivism and that its evaluation had led it affirmatively to recommend resumption of contact between Doe and M.S. Nor does the record reflect that the parole officials, in re-imposing the ban in September 2013, investigated or considered Doe's behavior during the immediate prior seven months, when

Doe had resided, without incident, with M.S. The parole officials therefore cannot be said then to have made an individualized assessment of whether the compelling state interest in child safety justified a new ban on contact between father and son.

The four-week period between September 5, 2013, when the second ban took effect, and October 2, 2013, when Lima—after being contacted by Doe's attorney—agreed to initiate an investigation under the newly operative Parental Contact Protocol, therefore, like the first three-plus months of the first no-contact period, cannot be squared with strict scrutiny's requirements that a restriction on familial association advance a compelling interest and be narrowly tailored to do so.

The ensuing four-month period between October 2, 2013 and February 21, 2014, when Lima issued a determination reaffirming the denial of contact between Doe and M.S. presents a separate question as to substantive due process. In this period, an investigation was, finally, undertaken that attempted to evaluate, pursuant to the Parental Contact Protocol, Doe's suitability for contact with M.S. Some portion of this period was properly used for that evaluation, however belated it was; and the inquiry did probe some relevant issues, including the facts of Doe's criminal case, the views of Jane Doe, and the Bronx Family Court files underlying Doe's successful petition for visitation with L.S. However, the record does not supply any justification for this investigation—during which Doe was barred from all contact with his son—to take four months. Nor does the record reveal any justification for Lima's determination to last two months past December 19, 2013, when Rosado submitted his report. The Protocol called for a 45-day inquiry; Doe's counsel pressed Lima at the 63-day mark for a resolution; and the delay of more than another two months from that point forward is unexplained.

The wholesale ban on contact between Doe and M.S. between February 21, 2014 (when Lima reaffirmed his determination that no contact was appropriate), and May 22, 2014 (when Hogan reversed Lima's determination), also cannot be squared with strict scrutiny. Consistent with Hogan's reversal, which was based on substantially the same information, the evidence before Lima clearly did not justify a complete ban. Lima based his conclusion on (1) the facts of Doe's rape conviction, which, he noted, had involved manipulation of a victim, and had occurred in a family sitting; (2) Doe's continued denial of guilt for that offense, which led Lima to doubt that Doe had made "true progress" in treatment; and (3) the fact that the victim of the rape offense opposed permitting Doe to have contact with his son, *see* JSF ¶ 82 ("Why should he live happy and comfortable when he took something from [me] that [I] can't get back[?]"). Even assuming, however, that the first and second of these factors might justify some restrictions on contact between Doe and M.S.,[6] these did not justify a complete ban on contact between Doe and his infant son, particularly given the ensuing clinical evaluations of Doe had not found a risk that Doe would abuse his infant son, and given the availability of obvious less restrictive alternatives, such as supervised visitation. And the after-the-fact reason Lima gave, during this litigation, for never considering the lesser alternative of contact subject to restrictions—that he did not detect any interest on Doe's part in contact with M.S. unless it was unrestricted—lacks a factual basis. The summary judgment record instead reflects that Doe repeatedly made plain his interest in maximal contact with M.S. and had never articulated an all-or-nothing position. Under *Myers* and *McGeoch*, Lima's duty was to narrowly tailor any restriction on Doe's family's interest in

---

[6] As to the third factor considered by Lima: While the views of the victim of Doe's sexual offense are entirely legitimate, those views—which expressed her continuing anger towards Doe but said nothing about the risk Doe might present to a child—did not bear on the constitutionally relevant inquiry: whether contact with Doe would jeopardize M.S.'s safety.

familial association to the interest on M.S.'s safety. The complete ban that Lima reaffirmed on February 21, 2014 bespoke no attempt to do so.

As to plaintiffs' procedural due process claim: Before depriving a person of a liberty or property interest, the state, consistent with due process of law, must use procedures that balance the interests involved in the deprivation. "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976) (quoting *Joint Anti-Fascist Regugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). The interests to be balanced are: "First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens or substitute procedural requirement would entail." *Id.* at 335 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263–71 (1970)). In assessing a process, "substantial weight must be given to the good-faith judgments of the individuals charged" with administering government programs as to the process due. *Id.* at 349. Nonetheless, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see also Londoner v. City and Cty. of Denver*, 210 U.S. 373, 386 (1908) ("[E]ven here a hearing, in its very essence, demands that he who is entitled to it shall have the right to support his allegations by argument, however brief: and, if need be, by proof, however informal.").

As this Court recognized in denying defendants' motions to dismiss, the Second Circuit has addressed the process that must be afforded by state officials when they remove a child from

a parent's custody out of concern for the child's safety, an analogous situation to that here. Although the parent has a fundamental liberty interest in his or her relationship with the child, the state has a "profound" interest in the child's welfare. *Tenenbaum v. Williams*, 193 F.3d 581, 593–94 (2d Cir. 1999). The Second Circuit has held that balancing these two weighty interests permits the separation of the parent and child without a pre-deprivation hearing in emergency circumstances, meaning a situation in which "the child is immediately threatened with harm," *id.* at 594 (quotation omitted), which includes "the peril of sexual abuse," *Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003). But the state still has the duty to undertake a "prompt" post-deprivation hearing after the child has been separated, as "the constitutional requirements of notice and opportunity to be heard are not eliminated but merely postponed." *Kia P. v. McIntyre*, 235 F.3d 749, 760 (2d Cir. 2000) (quotations omitted). And "the burden of initiating judicial review must be shouldered by the government." *Id.* (quotation and alteration omitted).

Applying these principles to the undisputed facts, plaintiffs' procedural due process rights were violated—in both periods—by the imposition of the ban on all contact between Doe and M.S.

In the first period of separation, even assuming an emergency justified the removal of Doe from his residence without a hearing, defendants were required to initiate a prompt post-deprivation hearing that gave Doe a meaningful opportunity to be heard. They did not do so. After Doe moved out on October 4, 2012, it was not until January 29, 2013—nearly four months later—that Doe was first interviewed by a social worker as part of the belated investigation into whether Doe posed a threat to M.S. JSF ¶¶ 41–47, 56–58. Particularly given the fundamental liberty interest at stake—a parent's access to his newborn—that delay "violate[ed] [Doe's] due process rights." *McGeoch*, 546 F. App'x at 49; *see also Kia P.*, 235 F.3d at 761 (suggesting that

a period of 10 days in which parent and child were kept apart, even if "solely for purposes of protecting the child from possible abuse or improper parental care . . . without a hearing . . . [poses] a serious danger that . . . defendants would have violated the plaintiffs' procedural due process rights"). The Court need not fix the precise date on which the absence of a post-deprivation hearing deprived plaintiffs' of their right to procedural process. Under any analysis, the parole authorities' failure to afford Doe a hearing became unconstitutional long before January 29, 2013.

The same principles guide the assessment of the second period. By the time Doe was ordered to leave the family residence with M.S. on September 5, 2013, Doe had resided with M.S. for nearly seven months without known incident, since Scott permitted him to return home on February 7, 2013. JSF ¶¶ 59, 68. And Scott's supervisors had internally been aware since mid-June 2013 that Scott had permitted Doe to reside with M.S. *Id.* ¶ 62. During the ensuing two months, they assembled Family Court records and the NYCATS reassessment, *id.* ¶¶ 62–68, but they did not arrange a pre-deprivation hearing. Instead, they abruptly told Doe, on August 22, 2013, that he was required to move out of the family home and would have to return to the homeless shelter, a decision that took effect on September 5, 2013. *Id.* ¶¶ 66–68.

Under these circumstances, the parole authorities cannot claim that an emergency justified dispensing with a pre-deprivation hearing. *See Tenenbaum*, 193 F.3d at 593–94 (parents and children may be separated in "emergency circumstances" but, "[a]s a general rule . . . before parents may be deprived of the care, custody or management of their children without their consent, due process . . . must be accorded to them"); *see also Wolf Child*, 699 F.3d at 1092–93 (district court's reasoning that defendant "'is now a convicted sex offender' and 'cannot be trusted with minor children'" did not justify a ban on contact with persons under age 18, given

the need to comply with the "requirements for imposing conditions that infringe on particularly significant liberty interests," which require explaining "how on the basis of [the record] evidence the particular restriction is justified").

The parole officials also denied Doe a prompt post-deprivation hearing in connection with the second period. Valerio did not meet with Doe until October 10, 2013, more than a month after Doe had been ordered out of the home. And the justifications given for initiating the second no-contact period, which lasted nearly nine months, were not based on facts developed in an individualized investigation into the threat Doe ostensibly posed to M.S. Instead, the parole officials' stated basis for removing Doe anew in September 2013 largely consisted of the circular argument that the special parole condition required it, whereas, in fact, that condition allowed these very officials to permit contact between Doe and M.S. At the same time, the parole officials, before depriving Doe of this important liberty, made no effort to investigate perhaps the most relevant evidence: whether Doe's contact with M.S. over the preceding seven months raised concerns about M.S.'s safety. A final basis for finding a procedural due process violation is presented by the nearly nine-month period that parole authorities took before determining that Doe could safely return home. Defendants have not articulated a justification, under the *Mathews* balancing analysis, for why so long a period of deprivation was necessary for their investigation to proceed.[7]

---

[7] Lima generally testified that there were "severe staffing issues" in the parole office, blaming these and the complexity of the investigation for the time it took. *See* Lima Dep. 150–55; *see also* Lima Decl., Dkt. 265, ¶ 45 (same). But defendants adduced no substantiation for the bare claim of staffing shortages, let alone evidence justifying taking nine months before determining that Doe could return home unsupervised. This claim also does not explain, without more, why Lima took more than two months, after receiving Rosado's report on December 19, 2013, to make a determination (on February 21, 2014).

Accordingly, plaintiffs suffered violations of their substantive and procedural due process rights during both periods when Doe was separated from M.S. The Court now inquires whether the defendants sued here are liable for those violations.

**B.      Are the Individual Defendants Liable Under § 1983?**

Section 1983 provides redress for a deprivation of federally protected rights by persons acting under color of state law. To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56 (1978).

It is undisputed that defendants, all of whom were DOCCS employees, acted at all relevant times under color of state law. Defendants argue, however, that they are not liable for the violations the Court has found of plaintiffs' constitutional rights for two reasons: They (1) are protected by qualified immunity and (2) were not personally involved in the violations.

**1.      Defendants' Claim of Qualified Immunity**

Lima, Valerio, and Rosado assert they are entitled to qualified immunity as a basis for entry of summary judgment in their favor. Cappiello invokes qualified immunity as a basis for opposing plaintiffs' motion. In denying the motions to dismiss, the Court rejected defendants' similar claim of qualified immunity. Insofar as the facts established in discovery largely track those pled and are substantially undisputed, the Court's analysis here is similar to that on the motions to dismiss. However, because a different standard applies to a qualified immunity claim on summary judgment, and because the qualified immunity inquiry requires attention to each distinct point in the chronology of events, the Court revisits defendants' claim.

Qualified immunity protects federal and state officials from money damages unless the facts show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A state official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his [or her] shoes would have understood that he [or she] was violating it." *City and Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citation and alterations omitted). "Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The purpose of qualified immunity is to "give[] government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City and Cty. of San Francisco*, 135 S. Ct. at 1774 (quotation and alterations omitted). Qualified immunity is "an affirmative defense on which the defendant officials bear the burden of proof." *E.g.*, *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

As the Court recognized in denying the motions to dismiss, the fundamental rights substantively at issue here were well established as of the events at issue. A line of decisions including those in *Myers*, *McGeoch*, *Troxel*, *Santosky*, and *Southerland*, as reviewed above, had established that a parent has a fundamental liberty interest in maintaining a relationship with his or her child protected by the Due Process Clause; that the child has a reciprocal interest; that restrictions on these liberty interests are subject to strict scrutiny and as such must be narrowly tailored to serve a compelling state interest; and that these standards apply to parole conditions

akin to those here.  *See Doe v. Annucci*, 2015 WL 4393012, at *11–15.  The procedural rights of a parent and child to a pre-deprivation hearing absent an emergency, or to a prompt post-deprivation hearing, had also been well-established, including in the Second Circuit cases of *Nicholson* and *Kia P.*  Defendants do not argue otherwise.

Under these circumstances, defendants may establish qualified immunity only if, on the particular facts before them, "'officers of reasonable competence could disagree' on the legality of the actions at issue."  *Walczyk*, 496 F.3d at 154 (citation omitted).  On the undisputed facts, there is no such argument available to the parole officials here for much of the two periods in which Doe was denied contact with M.S.

As to the first period, some brief, initial period of mandated separation was presumably lawful (and certainly protected by qualified immunity) to enable the parole officials to gather facts and determine, in good faith, whether M.S. could safely be with Doe.  However, (1) there was no basis for such a period to last four months, and the officials' investigative efforts were sparse and effectively ended within two weeks; (2) the parole officers' decision to bar all contact was based not on a concerted investigation into the risk Doe posed to M.S., but on a blatant misreading of the special condition to bar all contact with M.S. and to leave the parole officials powerless to permit such contact, whereas in fact the condition gave the parole officials that very discretion and no DOCCS policy required Parole Board approval before the officials could so act, *see* Lima Dep. at 82–91; (3) even assuming the facts justified some restrictions on contact between Doe and M.S.—such as supervised visitation—or made such restrictions within the protection of qualified immunity, the parole officials here imposed a blanket restriction and admittedly made no attempt to tailor the restriction to Doe's circumstances; and (4) the officers

altogether denied Doe a prompt post-deprivation hearing.  These basic lapses were not judgment calls of the sort sheltered by qualified immunity

As to the second period, the Court assumes *arguendo* that imposition of some restrictions on Doe's contact with M.S. was justifiable within the protection of qualified immunity once the parole officials senior to Scott decided to review her grant of permission to Doe to return home. However, (1) despite taking more than two months between reopening this issue and demanding that Doe leave his home, the parole officers did not provide him a pre-deprivation hearing; (2) the investigation under the DOCCS protocol did not begin for a month after Doe left home, and, also without any evident justification, lasted four-and-a-half months, some three months beyond the 45-day period that the Protocol gave for such investigations; (3) the parole officers, in opting again for a complete ban on contact with M.S., again failed to tailor—or consider tailoring—this restriction, by now in the face of compelling evidence that a complete ban was unjustified; and (4) the officers altogether denied Doe a post-deprivation hearing, until Doe's lawsuit and bid for emergency relief in this Court forced them to resort to Hogan, the DOCCS regional director, to convene such a hearing (and to lift the ban, nearly nine months after it was imposed).  These lapses, too, were patent breaches of due process that fell outside the protection that qualified immunity extends for good-faith judgment calls.  This was not a case in which there was "an objectively reasonable basis for the[] decision, *whichever way they make it*."  *Doe ex rel. Doe v. Whelan*, 732 F.3d 151, 155 (2d Cir. 2013) (emphasis in original) (quoting *Tenenbaum*, 193 F.3d at 596).

The Court accordingly (1) denies defendants' summary judgment motions to the extent based on qualified immunity and (2) holds that qualified immunity does not supply a basis to

deny plaintiffs' summary judgment motions.  At the most, qualified immunity would bar liability for a very limited portion of each of the two periods.

### 2. Defendants' Personal Involvement

Liability under § 1983 requires that a defendant sued in his or her individual capacity be personally involved in the violation of the federal right; a defendant's supervisory authority is insufficient in itself to create liability under § 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2001).  "To proximately cause a . . . due process violation . . . a defendant must be personally involved in the violation.  A plaintiff may establish such personal involvement by making any one of five showings (the '*Colon* factors')."  *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

These are: that "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information that unconstitutional acts were occurring."  *Id.* (quoting *Colon*, 58 F.3d at 873); *see also Paterson v. Cty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004) ("[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his [or her] individual capacity under § 1983.  Personal involvement . . . includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to

take action upon receiving information that constitutional violations were occurring.") (citations omitted)).

As to particular *Colon* factors: "Direct participation" means "personal participation by one who has knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (citation omitted); *see also Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) ("[A] 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally.") (citing *Provost*, 262 F.3d at 155). Personal involvement is also satisfied when a parole officer "actually enforce[s]" a parole condition, for example, by arresting the parolee for a violation of parole even if that parole officer did not originally impose the parole condition. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006). "'[G]ross negligence' denotes a higher degree of culpability than mere negligence. It is the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of . . . harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). "A plaintiff pursuing a theory of gross negligence must prove that a supervisor's neglect caused his subordinate to violate the plaintiff's rights in order to succeed on her claim." *Id.* at 117.

The Court now applies these standards to the individual defendants.

### a.      First Separation Period

Plaintiffs claim that Lima, Rosado, Cappiello, and Scott were personally involved in the violations of their rights during the first period when Doe and M.S. were separated. They do not claim that Valerio was personally involved. Lima and Rosado dispute their involvement in this period; Capiello does not; and Scott, as noted, did not respond to plaintiffs' motion.

On the undisputed facts, the Court holds that Lima, Rosado, Cappiello, and Scott were each personally involved in the constitutional violations in this period. Most centrally, all four were involved in the October 4, 2012 decision to require Doe to move out of the family residence and have no contact with M.S. Rosado, Cappiello, and Scott together told Doe that he was barred from having contact with M.S. JSF ¶¶ 41–48.[8] Cappiello was the senior parole officer overseeing Doe's parole between September 2012 and April 2013. *Id.* ¶ 6. At the meeting with Doe, the three did not seek any input from Doe, including about his relationship with M.S.; they explained that their decision to deprive him of contact with his son was required by special parole condition 13, even though in fact it empowered the parole officers to authorize such contact. *Id.* ¶ 41. They did not consider authorizing limited contact or modified ban. *Id.* ¶ 43. Each's involvement in the formulation and communication of the decision to bar Doe categorically from contact with M.S. establishes the required personal involvement in the deprivation.

As for Lima, later the same day, as supervisor of the other three, he received a personal complaint from Doe about the order to leave home and separate from his son. *Id.* ¶ 47. He then spoke to Cappiello, Rosado, and Scott about that decision and ratified it, telling his subordinates that they made the correct decision given the special condition prohibiting such contact. *Id.* These events, most notably Lima's affirmative approval of the categorical ban, establish Lima's personal involvement in the deprivation of plaintiffs' rights.

The defendants' inaction during the ensuing four months, during which the ban remained in place, reinforces this finding. Until near the very end of the period, when Scott (alone) took

---

[8] Although Rosado, a senior parole officer, was not formally assigned to oversee Doe's parole supervision until the period of June 2013 until March 2014, he was involved in decisions about Doe's supervision starting in at least October 2012. *Id.* ¶ 5.

the actions that led her to rescind the ban, none of the four assessed or reassessed whether more narrowly tailored restrictions could assure M.S.'s safety. Nor did any act to commission a post-deprivation hearing. These lapses, whether cast as direct involvement in a continuing violation of the Doe family's constitutional rights or as gross negligence that enabled this violation to persist, support a finding of personal involvement. To be sure, Scott eventually took action to assess the central issue: to examine whether Doe actually presented a threat to M.S. *Id.* ¶¶ 56–59. Scott deserves credit for bringing about Doe's meetings with the NYCATS social worker on January 29 and February 4, 2013, whose recommendation led Scott, on February 7, 2013, to reverse the ban and permit Doe to return home. *See id.* But Scott's belated steps do not excuse her role in instating the ban and her failure, as Doe's immediate parole officer, to take any action to examine whether it was actually necessary for more than three months.

Defendants' arguments against liability are unpersuasive.

Rosado argues that he had no role in the October 4, 2012 decision to bar contact with M.S. But that argument is foreclosed by the undisputed facts to which Rosado stipulated in the JSF, which states that Rosado (with the others) made the decision to bar Doe from contact with M.S. *Id.* ¶¶ 41–43. Consistent with his admission of involvement, Rosado admitted in his declaration that he attended the October 4, 2012 meeting "in an advisory capacity," Rosado Decl. ¶ 13, Dkt. 245, and in his deposition that he provided Cappiello with "a lot of counseling" on the decision because he had significant experience supervising sex offenders on parole, Rosado Dep. at 92–93. Cappiello also testified that the process leading to the decision to bar Doe from contact with M.S. was "collaborative," Cappiello Dep. at 112; Scott, too, testified that Rosado made the decision that Doe had to leave the family residence and told Doe to do so, Scott Dep. at 51.

Lima argues that that his conduct on October 4, 2012 does not establish his personal involvement in the decision to bar Doe from contact with M.S. because he did no more than affirm that decision as correct. But Lima's ratification of that decision, after Doe complained to him, is enough to establish his personal involvement, and is undisputed. JSF ¶ 47. Reinforcing Lima's personal involvement is his testimony that he "probably agreed" with Cappiello that Doe "could not continue in the residence he was in," Lima Dep. at 204, that he "ha[d] no idea" if Cappiello later conducted any investigation into whether contact with Doe would jeopardize M.S.'s safety, and that the basis for barring Doe from contact with M.S. was Doe's prior offense and his (mis)reading of the special parole condition categorically to prohibit all "contact with somebody under the age of 18," *id.* at 205.

### b. Second Separation Period

Plaintiffs claim that Lima, Valerio, Rosado, and Scott were personally involved in the deprivations of their rights during the second period when Doe and M.S. were separated. Plaintiffs do not claim that Cappiello was personally involved. Lima does not dispute his involvement; Rosado and Valerio dispute theirs; and Scott, again, has not responded to plaintiffs' motion.

On the undisputed facts, Lima, Rosado, Valerio, and Scott were personally involved in the constitutional violations during this period.

As to Rosado, he resurrected the issue of whether Doe—now back at home—should be separated anew from his family, instructing Scott to review that issue, including with Lima. JSF ¶¶ 62–64. Rosado then participated in the decision—made without a pre-deprivation hearing— again to deny Doe all access to M.S.; Rosado directed Scott to order Doe to move out of the family home as soon as possible. *Id.* ¶¶ 62–65. That decision again was based on a reading of

the special parole condition to require complete separation; Rosado and the other officers did not

consider whether a more narrowly tailored restriction might suffice.  Through March 2014,

Rosado was the senior parole officer assigned to oversee Doe's supervision.  *Id.* ¶ 5.  Further

demonstrating his engagement in this issue, around September 19, 2013, Rosado stripped Scott

of supervision of Doe because Scott had earlier permitted Doe to have contact with M.S.  *Id.*

¶ 69.  Finally, after an investigation was initiated pursuant to the Parental Contact Protocol,

Rosado, on October 2, 2013, met with Lima and Scott to discuss how the investigation into

Doe's request for parental contact would proceed, *id.* ¶¶ 72–74; and, on December 19, 2013,

Rosado reported to Lima on the investigation, after which Lima reaffirmed the ban on contact,

*id.* ¶ 85 & Ex. I.

In his defense, Rosado argues that he lacked ultimate authority over the decision

regarding Doe's contact with M.S.  But final authority is not required for personal involvement,

which can be established by a parole officer's mere enforcement of an unconstitutional

condition.  *See Farrell*, 449 F.3d at 484 (personal involvement requirement is satisfied when

defendant parole officer enforces a condition, even when that condition had been imposed by

another parole officer).  In any event, whatever the capacity of higher-ups to overrule Rosado,

the undisputed facts reveal his exercise of authority over that decision; and Doe's special

condition 13 itself empowered even Rosado's subordinate, the line parole officer, to authorize

contact.  Further, as Lima testified without contradiction, there was no protocol in DOCCS that

required a parole officer to obtain Parole Board approval before permitting contact between a

convicted sex offender and his child.  Lima Dep. at 83–85.  As Lima further admitted, there was

similarly "no written rule" that required a parole officer to obtain permission from his or her

senior parole officer or other parole officers senior in the chain of command, though Lima testified that it was "good practice" to do so. *Id.* at 83–84, 89–91.[9]

Valerio makes the same argument: that the decision to bar Doe from contact with his child was made above his pay grade. But Valerio undisputedly participated in that decision; and, as Doe's parole officer, had discretion under to modify Doe's conditions of contact with M.S. as expressly permitted in special condition 13. Moreover, Valerio enforced the decisions by Rosado and Lima to prohibit contact between Doe and M.S. Valerio was Doe's parole officer starting in September 2013, replacing Scott, JSF ¶ 69, and knew that Doe contested the blanket prohibition as illegal. *Id.* ¶ 77. Valerio's enforcement of this unlawful ban is sufficient to establish his personal involvement under § 1983. *See Farrell*, 449 F.3d at 484.

As to Scott, she, too, enforced the new prohibition on contact with M.S. that Lima and Rosado had put in place: On August 22, 2013, Scott told Doe that he was not allowed to have contact with M.S. and would need to leave home. JSF ¶ 66. Scott thereby participated in the deprivation of Doe's rights, although her role in doing so ended on September 19, 2013, when Rosado replaced her with Valerio. *Id.* ¶ 69.

Finally, as to Lima, the facts easily establish—and he does not dispute—his personal involvement in the acts held to violate Doe's rights in the second period. On August 6, 2013, in consultation with Rosado, Lima decided that Doe must leave the family residence. Lima did so without holding a pre-deprivation hearing or considering the facts that suggested, at a minimum,

---

[9] To be sure, Lima testified that although a parole officer "technically" has the authority to permit contact, as a matter of "common sense" an officer would not exercise it because the "reality" is that "[i]f a parole officer made that decision independently, their level of potential accountability would be significantly higher." Lima Dep. at 82–85. A parole official's concern over being held accountable for a decision is, however, no basis for clearly infringing a parolee's constitutional rights.

that there were less restrictive means of assuring M.S.'s safety. *Id.* ¶ 65. Not until after the ban had been in place for a month, and after Doe's attorneys' had asserted that the ban was illegal, did Lima initiate an investigation under the Parental Contact Protocol. *Id.* ¶¶ 73–74. Lima's investigation under the Protocol lasted four and a half months, during which Doe's separation persisted, *id.*, at the conclusion of which Lima reiterated the complete ban, *id.* ¶ 87. On the undisputed facts, Lima, more than anyone, owned the decision, during the second period, to categorically deny Doe contact with M.S.

The undisputed facts thus establish each defendant's personal involvement in depriving Doe, Jane Doe, and M.S. of their substantive and procedural due process rights. Plaintiffs are entitled to judgment as a matter of law as to defendants' liability for such violations.

## CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' motion for summary judgment as to liability against all five defendants, and denies the motions for summary judgment filed by defendants Lima, Rosado, and Valerio.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 233 and 264.

An order will issue shortly as to next steps in this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 31, 2017
      New York, New York